Argued January 8, modified February 18, 1970

# WEST HILLS, INC., *Respondent, v.* STATE TAX COMMISSION, *Appellant.*

465 P. 2d 233

*Alfred B. Thomas,* Salem, argued the cause for appellant. With him on the briefs were Lee Johnson, Attorney General, and Donald C. Seymour, Assistant Attorney General, Salem.

*J. V. Hurley,* Bend, argued the cause for respondent. With him on the brief were Gray, Fancher, Holmes & Hurley, Bend.

TONGUE, J.

This is an appeal by the State Tax Commission from a decision of the Oregon Tax Court (3 OTC Adv Sh 409), reversing in part the Commission's order establishing the value of the taxpayer's real property for tax purposes.

The taxpayer's property consists of a real estate subdivision of 100 acres in Bend. The subdivision is composed of lots in three stages of development: (1) fully developed lots, which were assessed by the

assessor at $13.75 per front foot (or $1,375 for a one hundred foot lot); (2) partially developed lots with water lines installed, but no paved streets, which were assessed at $11.25 per front foot, and (3) undeveloped lots, which were assessed at $8.75 per front foot.

For the fully developed lots these values were determined by the assessor by applying a 45% "holding factor" to a valuation of $25 per front foot (the present selling price of the fully developed lots, or $2,500 for a one hundred foot lot) to reach a "true cash value" of $13.75 for such lots. The "holding factor" was based on the time the market "indicated" that it would take to sell all of such lots, so as to arrive at a "true cash value" from the standpoint of an investor interested in purchasing the entire subdivision.

For the partially developed lots, with water lines installed, but without paved streets, a deduction was first made by the assessor of $5 per front foot for the agreed cost of installing such streets from the $25 per front foot "starting point" and the 45% "holding factor" was then applied, so as to arrive at a "true cash value" of $11.25 per front foot for such lots.

For the undeveloped lots, without either paved streets or water lines, the assessor deducted $10 per front foot (to include $5 per front foot as the agreed cost of installing such streets and $5 per front foot for the cost of installing water lines) from the $25 per front foot "starting point" and the same "holding factor" of 45% was then applied, so as to arrive at a "true cash value" of $8.75 per front foot for undeveloped lots, without either streets or water lines.

This method of appraisal, as adopted by the county assessor and as subsequently approved by the Com-

mission, is a variation of the "development method" of appraisal, as distinguished from the "market data method" of appraisal, which is based upon comparing sales data from comparable sales.

After the Commission had entered an order approving the foregoing basis for valuation of the taxpayer's subdivision, the taxpayer filed these proceedings in the Tax Court to set aside that order and to reinstate certain reductions as previously ordered by the County Board of Equalization. After hearing testimony, the Tax Court approved the assessor's valuation of $13.75 per front foot as the "fair market value" for the fully developed lots (as also agreed upon by both parties), but rejected the valuations of $11.25 per front foot for the partially developed lots and $8.75 per front foot for the undeveloped lots.

Based on testimony that comparable undeveloped land had a fair market value of $1,000 per acre and that one acre would subdivide into three lots, each with a frontage of one hundred feet, the Tax Court found that the valuation of the undeveloped lots was $333, or $3.33 per front foot. The court then added the cost of surveying at 35¢ per front foot to arrive at a total of $3.68 per front foot for the unimproved lots, taken as a whole and as a part of the entire subdivision.

The Tax Court also originally found that the value of the partially developed lot should be determined by deducting $5 per front foot for the cost of paved streets from the agreed value of $13.75 for the fully developed lot, so as to arrive at a value of $8.75 per front foot for the partially developed lots.

The Commission then filed a petition for rehearing to reinstate the assessor's valuations of the partially developed lots and the undeveloped lots, after which the Tax Court not only declined to do so, but

further reduced the value of the partially developed lots to $7.90 per front foot.[1]

In appealing from the decree the Commission contends not only that the trial court erred in the method by which it arrived at the value of the partially developed lots, but that it also erred in rejecting the valuations by the assessor for both the partially developed lots (at $11.25 per front foot) and the undeveloped lots (at $8.75 per front foot), as well as in rejecting the "development method" of appraisal, as adopted by the assessor in arriving at the foregoing values.

The taxpayer, on the other hand, contends that there was sufficient evidence of comparable sales of undeveloped land so as to provide a proper basis (without resort to the "development method" of appraisal) for the finding by the trial court that the undeveloped lots had a "true cash value" of $3.68 per front foot (including the survey cost of 35¢). The taxpayer also contends that the value of the partially developed lots at $7.90 per front foot can be sustained either by the method adopted by the Tax Court or by alternative methods.

Thus, the first question to be decided is whether, in using the "development method" of appraisal, the

---

[1] In arriving at this conclusion, (which is not pertinent to the ultimate determination of this case) the Tax Court found that the difference between $25 per front foot (the sales price of fully developed lots) and $3.68 (the cost of undeveloped lots) or the sum of $21.32, included, after deducting $10 for the cost of water and paved streets (at $5 each) a profit of $11.32 per front foot on the fully developed lots. The Tax Court then allocated one-half of such profit to the improvement of the lots by installation of water lines and one-half to the improvement by installation of paved streets, in such a manner as to arrive at $7.90 as the "true cash value" of the partially developed lots and $13.75 for the fully developed lots, after also deducting a 45% "holding factor".

assessor adopted the proper method of appraisal in determining the value of the undeveloped lots and the partially developed lots.

It is agreed by the parties that if there was not sufficient evidence of comparable sales of undeveloped land, then the use of the "development method" of appraisal was proper for use in determining the value of not only the undeveloped lots and the partially developed lots, but also the fully developed lots. On the other hand, it is also agreed that if there was sufficient evidence of comparable sales of undeveloped land, then the use of "development method" of appraisal was not proper at least for the purpose of determining the value of the undeveloped lots.[2]

Thus, it is necessary to determine whether there was sufficient evidence of comparable sales of undeveloped land so as to support the findings by the Tax Court that the undeveloped lots had a "true cash value" of $3.68 per front foot. This value was based upon a finding that such land was worth $1,000 per acre, including three lots with a hundred foot frontage, each worth $333, plus the cost of surveying of $35 per lot, (or 35¢ per front foot).

The Commission contends that the "development method" of appraisal, as used by the assessor, was proper because the only market evidence to support a determination of the "true cash value" of the undeveloped land was "a single sale of property by the taxpayer in 1963, four years before the assessment date", consisting of a sale for $30,000 of 35 acres of undeveloped and unsubdivided property with an "access problem" and was located outside the city limits,

[2] To the same effect, see "Appraisal of Real Estate", 5th ed., pp 126-8.

so as not to qualify for the city "subsidy", under which paved streets could be installed for $5 per front foot. Also, according to the Commission, two parcels of that property were also resold subsequently in seven or eight eight acre tracts for in excess of $3,000 per acre.

In support of the contrary contention, the taxpayer offered evidence of three sales of nearby unimproved property at approximately $1,000 per acre, as well as the testimony of Mr. Coats, plaintiff's president. The testimony of Mr. Coats was based upon his ownership of approximately 1,700 acres of property in the immediate vicinity, including the one hundred acres subsequently sold to plaintiff, as well as his experience and knowledge in real estate development in that area, and as an engineer and contractor, since 1953. On that basis he testified that, in his opinion, the value of such property was $1,000 per acre.

With reference to the three sales contended by the taxpayer to be "comparable", the first (the sale referred to by the Commission) was a sale by Mr. Coats for $30,000 of about 35 acres directly adjacent to the property involved. While that sale was made in 1963 or 1964, Mr. Coats testified that the 35 acres was comparable property and that the prices of lots in that area had not changed between then and 1968. There was no evidence to the contrary, except for testimony that two small parcels of that acre tract were sold later for approximately $3,000 per acre. While it is true that the 35 acre tract had no access at the time of sale, that fact was apparently not then known, at least by the purchaser. It is also true, however, that the 35 acre tract was not subdivided and that it was outside the city limits, although directly adjacent to the property in question.

The second sale of nearby unimproved property

was the sale of forty acres, also directly adjacent to the property involved, for $1,000 per acre. That sale was made in 1967 by Mr. Coats and his wife to plaintiff corporation. Again, Mr. Coats testified the property was "very comparable". Apparently that property was not subdivided prior to such sale, and it does not appear whether or not that property was within or outside the city limits.

The third sale of unimproved property was a sale of eighty acres, also "right next to this place", but outside the city, for $88,000 and was made "after the sale of this". The testimony relating to that sale was given during cross-examination and redirect examination by Mr. Coats, who also testified that it was "very comparable" property, without further details.

In addition, Mr. Coats testified on cross-examination that there had been a sale of unimproved property of undisclosed size outside the city limits for $3,000, but that it was relatively flat, with the result that paved streets could be installed for less than $5 per front foot and that it had "a water main right up to one side of it."

There was also testimony that after the appraisal by the county assessor the taxpayer advertised the property for sale in the newspaper and by radio for three months at the price set by the assessor, without success, and that the county had also tried unsuccessfully to sell the unimproved property adjacent to the taxpayer's property, and outside the city limits, for $500 per acre.

In addition, at the conclusion of the trial (which was held in Deschutes county), the tax court judge viewed the property, so as to better understand and evaluate the testimony offered on trial.

■ In our opinion, the foregoing testimony, when

taken together, was sufficient to support the finding by the tax court that the undeveloped lots, taken as a whole, did not have a "true cash value" of $2,500 per acre, or $8.75 per front foot, as found by the assessor, using the "development method" of appraisal, but had a "true cash value" of $1,000, or $3.33 per front foot for three one hundred foot lots, plus the cost of surveying of 35¢ per front foot, resulting in a total of $3.68 per front foot.

■ The tax court judge, after observing the witnesses and their demeanor, was in a better position than this court to determine what consideration, if any, should have been given to the fact that most of such testimony was by an interested witness, as well as to other facts going to the weight of his testimony. As held in *State by and through Road Commission v. Williams,* 22 Utah2d 317, 452 P2d 872, at 874:

"* * * when there is a substantial basis in the evidence for the trial court to believe that the test of 'reasonable comparability' is met and he has admitted the evidence, the extent of such differences should be considered as going more to affect the weight of the evidence than its competency."

See also Bonbright, 1 Valuation of Property, p 138.

It may be that evidence of the sale of unimproved and unsubdivided lots would not have been admissible, on proper objection, as evidence of the value of unimproved lands which had been subdivided, but even in such cases the courts sometimes recognize an exception when the subdivision has been "on paper only". *Continental Development Corp. v. State,* Tex Civ App 337 SW2d 371 (1968); *Sanitary District of Chicago v. Baumbach,* 270 Ill 128, 110 NE 331 (1915). See also 118 ALR 869, 884; 85 ALR2d 110. In this case,

however, all of the foregoing testimony was received without objection.

The next question is whether the "fair market value" of the fully developed and the partially developed lots could still be properly determined by use of the "development (or "subdivision") method" of appraisal (or by any method, under the record of this case) if the value of the unimproved lots is not to be determined by that method, but by the "market data method."

Thus, it is contended by the State Tax Commission, in its reply brief, that:

"* * * when the lower court accepted the $13.75 per front foot value for the *fully developed lots,* it accepted a part of the subdivision value under the assessor's method, which part, in fact, is *undervalued because an average discount was used.* If the fully developed lots (sold early during the nine-year period) were valued on a discount computed separately for them, the values would approach the $25 per front foot selling price." (Emphasis added)

And, later, that:

"Undervaluation of plaintiff's property clearly results when the court accepts the 45 percent [sic] reduction as to fully developed lots ($13.75) which are to be immediately sold and rejects the rest of the method."

The difficulty with this contention is that there is no satisfactory evidence in the record that the fully developed lots were "undervalued", either because the appraiser used an "average discount" or because they would be "immediately sold". On the contrary, the Commission contended in its opening brief, with reference to the fully developed lots, that:

"* * * the presence of the paving in the fully

developed lots is actually a liability since it constitutes an investment which must be carried for an average of four and one-half years (based on the agreed nine-year sellout [sic] period)."

It may be true that some of the fully developed lots might be sold before the water lines and paved streets were installed for the remainder of the subdivision. On the other hand, it also may be true that upon the completion of such improvements some of the lots now classified as unimproved or partially improved lots would be sold before some of the lots now classified as fully developed lots. Also, in order to properly evaluate this problem it would at least be necessary to know how many lots there are in each category, i.e., fully developed lots, partially developed lots and undeveloped lots. Unfortunately, the Commission offered no such evidence.

In any event, both the county assessor and the Commission expressly found that the "true cash value" of the fully developed lots was $13.75 per front foot.[9] The taxpayer accepted that valuation and did not seek to set it aside in these proceedings.

No contention was made by the Commission at the time of trial before the Tax Court that the finding that unimproved lots had a value of $3.68 (or any other value) on a "market data" basis, would require reconsideration of its finding that the improved lots had a value of $13.75 and that they were undervalued at that price, so as to enable the Tax Court to con-

---

[9] The opinion of the Commission includes the following statement:
"After applying the 45% holding period factor, based on the time the market indicates it would take to sell all the lots, the true cash value of developed lots was determined to be $13.75 a front foot."

sider that contention. Thus, regardless of what method of appraisal was used or should have been used, there was no issue before the Tax Court relating to the evaluation of the fully improved lots.

Similarly, in its petition for rehearing, as filed by the Commission with the Tax Court, no such contention was made by it. On the contrary, that petition complained only of the findings by the Tax Court relating to valuation of the unimproved and partially improved lots.

To the same effect, on appeal to this court the sole and only "proposition" urged by the Commission in its opening brief is that:

> "The lower court erred in reducing the value on plaintiff's partially developed subdivision lots and in reducing the value of plaintiff's undeveloped subdivision lots."

Indeed, the Commission's opening brief also includes the further statement that:

> "The court approved the county's determination of $13.75 for the fully developed lots *it being agreed to by the parties.*" (Emphasis added)

and complained only that the Tax Court:

> "* * * in attempting to reconcile the assessor's subdivision method of valuation with plaintiff's testimony (Mr. Coats) that raw acreage was worth $1,000 per acre * * * was not able to satisfactorily reach a value for lots with water and without paving and the lots with neither."

Thus, although the Commission was at all times fully informed of the taxpayer's contention that the undeveloped lots should be valued on a "market data" basis at $1,000 per acre, or $3.68 per front foot (including survey costs) and that the taxpayer acquiesed

in the Commission's valuation of the improved lots at $13.75 per front foot, the Commission never raised any question as to the accuracy of that valuation until its reply brief on appeal.

■ On this state of the record it is our conclusion that the Commission is bound by its agreement that the "fair market value" of the fully developed lots is $13.75 per front foot. It follows that this court cannot properly consider the present contention by the Commission that the fully developed lots were "under-valued", if considered separately from the valuation of the unimproved lots and by application of a different appraisal method, even though that contention might have had merit if made in the Tax Court and if supported by evidence at that time.

■ The final problem involves the "fair market value" of the partially developed lots. It is true that the valuation of the partially developed lots may present some problem under the record in this case from the standpoint of conflicting theories of appraisal. It is clear, however, that the partially developed lots represent lots in which one-half of the cost of improvement has been expended, it having been agreed that the cost of installation of water lines and of paved streets is the sum of $5 each, on a front foot basis. Thus, since the "fair market value" of the fully developed lots has been agreed to be $13.75 per front foot and the value of the undeveloped lots has been found to be $3.68 per front foot, a strong contention can be made that the "fair market value" of the partially developed lots should be determined to be the sum of $8.72 per front foot—the mid-point between the two—and that this is the fairest and most practical means of resolving this problem.

It is also most significant that the results thus

reached, with a valuation of $3.68 per front foot for undeveloped lots, $8.72 for partially developed lots (with water lines but no paved streets) and $13.75 for fully developed lots is the equivalent of adding the agreed cost of such improvements ($5 for water lines and $5 for paved streets) to the value of the undeveloped lots. This strongly verifies the basic fairness of such a result. It is a common method of appraisal of subdivision property to determine the fair market value of the undeveloped acreage and add the cost of development.[⊛] Indeed, the only objection by the Commission to the adoption of that method in this case was that "the market evidence supporting this theory is a single sale of property  *  *  *"—contention which we have held to be without merit under the record of this case.

It follows that the decree of the Tax Court must be modified by increasing the valuation of the partially developed lots from $7.90 to $8.72 per front foot. In all other respects that decree is affirmed.

Modified.

McALLISTER, J., dissenting.

In my opinion the decree of the Tax Court should be reversed and the opinion and order of the State Tax Commission numbered VL 68-87, dated April 16, 1968, should be reinstated. I, therefore, respectfully dissent.

---

[⊛] Friedman, Encyclopedia of Real Estate Appraising, pp 483-509. See also Zangerle, Principles of Real Estate Appraisal, p 210.