# IN THE OREGON TAX COURT

## CKW ENTERPRISES
*v.*
## DEPARTMENT OF REVENUE
(TC 2147)

Thomas E. Elliott, Corvallis, represented plaintiff.

Marilyn J. Harbur, Assistant Attorney General, Department of Justice, represented defendant.

Decision for defendant rendered April 18, 1985.

**CARL N. BYERS, Judge.**

Plaintiff appeals the assessed value of 18 condominium units located in the City of Corvallis. The units are part of a cluster of 36 similar units. The 18 units in question are not all contiguous to each other but are located in different parts of the condominium project.

One appraiser testified on behalf of each party. The county appraiser considered each condominium unit individually, utilizing both the cost approach and the market approach. Relying primarily upon the cost approach, the county appraiser found a value of $66,420 for each unit. The plaintiff's appraiser utilized all three approaches to value in determining a value of $46,110 per unit. It should be noted

that plaintiff, as the developer of the condominium project, has been unable to sell the 18 subject units and has been compelled to rent them for income to offset expenses. Plaintiff's appraiser utilized the rental income in determining the value of the units.

The primary difference between the two appraisers is that plantiff's appraiser viewed the 18 units as one subject property and applied a "developer's discount." The discount calculated by plaintiff's appraiser reflects the expenses and delay that would be incurred in trying to market the 18 units. The appraiser made an absorption study to determine the rate of sales or the time over which the 18 units in question could be marketed. From that study, the appraiser then determined the discount that should be applied for the delay in receipt of the purchase prices and the holding and selling expenses. In this case, the appraiser found that each unit, which normally would have a market value of $62,000, should be discounted to $46,110.

The developer's discount or time discount as used here is recognized and applied in what is commonly known as the subdivision approach to value. For example, where vacant land is zoned and available to be developed for a residential subdivision, its present value may be estimated by considering its worth as a potential subdivision. This is done by estimating the cost of streets, curbs, utilities and other expenses required to develop the property into a subdivision and estimating the selling prices and the selling expenses of the completed lots. Based on an absorption study of comparable subdivision sales, the appraiser then discounts the amounts to be received from the future lot sales by the holding and selling costs incurred and a factor for the present worth of money to be received in the future. A more complete description of the subdivision approach is set forth in some detail in the *Encyclopedia of Real Estate Appraising,* ch 32, Appraisal of Vacant Land Development Analysis, 735 (Friedman ed, 3d ed 1978). The method is also mentioned in other recognized appraisal texts such as Ring, *The Valuation of Real Estate* 127 (2d ed 1970) and the American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 533 (8th ed 1983).[1]

---

[1] It appears that the method has also been used in valuing cemetery lands but only on land yet to be developed as a cemetery. American Institute of Real Estate Appraisers, II *Condemnation Appraisal Practice* 518 (1973).

■     Logic and the above appraisal authorities seem to indicate that for ad valorem tax purposes, the subdivision approach should be limited to those cases where the value sought is the present worth of property which is yet to be developed. In such cases, the property is (or may be) a single tax lot and its value is based on its potential as a whole. Once property is developed or improved and separated into individual units for tax purposes, the tax authority has no legal or rational basis for discounting the value of each unit because of who owns the units.

The subdivision approach was considered in *West Hills, Inc. v. Tax. Com.*, 255 Or 172, 465 P2d 233 (1970). While it is not clear from the record in that case whether it was properly applied, in approving the use of the method, the court noted, at 185, that:

> "It is a common method of appraisal of subdivision property to determine the fair market value of the *undeveloped* acreage and add the cost of development." (Emphasis added.)

■     If developed lots or units are discounted, what standard is to be applied for the number of lots or condominium units to be held? Is the developer who holds three lots entitled to a discount as well as the developer who holds 30 lots? If the developer's discount can be applied to improved subdivided lots and condominium units, then why not to other kinds of buildings and structures? Why should the discount be limited to developers? An individual owning 18 houses scattered around the city, all of which are rented for their income, would incur the same kinds of expenses and delay in marketing such properties as plaintiff has in marketing the subject condominiums. The above questions make it clear that plaintiff seeks a different value than that of ORS 308.205. The developer's discount, as applied here, would estimate value based on the present worth of expected sale proceeds. The "market value" sought by the statute is the gross market price. A homeowner, whose residence may have cost $100,000, does not receive a discount or lesser true cash value because he would incur real estate commissions and other selling expenses in order to realize the value in dollars.

Plaintiff maintains that the market for the subject units is not that of the individual home buyer but another developer or investor. Plaintiff argues that this fact mandates

the use of the developer's discount since the potential purchaser would clearly recognize the expenses of marketing the property. This argument assumes that all of the units constitute a single property. However, it is clear that each condominium unit should be treated as the "unit" of property for assessment and taxation.[2] The condominium units are separate tax lots with separate tax account numbers. They are not all contiguous units of property nor particularly interrelated. Each unit is separately used, and may be separately owned and separately sold. The fact that the units are owned by one person or entity does not affect their individual taxable status. Under these circumstances, the owner could not have them treated as a single property for tax purposes even by formal request. *Penn Phillips Lands v. Dept. of Rev.,* 255 Or 488, 468 P2d 646 (1970).

The court acknowledges the plight of and has sympathy for developers and builders caught in the current low tides of Oregon's home building industry. But sympathy is neither a principle of appraising or of assessing taxes. The developer's discount cannot be allowed or applied to the subject 18 condominium units.

Having resolved the discount issue, the court has considered the evidence of the appraisers as to the true cash value of the units in question. It appears from the evidence adduced that the subject units are good quality. When they sell it is typically in the range of $65,000 to $69,000. Based on this evidence, the difference in value between the plaintiff and the defendant's values per unit is so slight that the court is unable to find error in the assessed values. Therefore, the court finds the true cash value of each unit as of January 1, 1982, to be $66,420. The Opinion and Order No. VL 84-410 of the Department of Revenue is hereby sustained.

---

[2] Although the term "unit of property" is only ambiguously discussed in the Department of Revenue's administrative rule (*see* OAR 150-308.205-(A)(1)(b), it is clearly related to what is exchanged in the marketplace.