# IN THE OREGON TAX COURT

## FIRST INTERSTATE BANK OF OREGON, N.A.
*v.*
## DEPARTMENT OF REVENUE
(TC 2515)

Thomas H. Hoyt, Hoyt, Gaydos & Churnside, Eugene, represented plaintiff.

Marilyn J. Harbur, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered July 10, 1987.

**CARL N. BYERS, Judge.**

This is an ad valorem tax case concerning 32 residential subdivision lots and a parcel identified as Tract C. The subject property comprises most of the Spencer's Crest Subdivision which is located in the south hills area of the City of Eugene. Selected during a building boom period, the site is objectively a poor one for subdivision. The subdivision was platted as a planned unit development (PUD), which permits privately owned streets because it is too steep for all of its streets to be city maintained. A number of the lots are on steep slopes and would require higher than usual building costs. The steepness of the terrain also contributes to the subsidence of land, resulting in higher maintenance expenses for the private streets, drainage and other associated problems. In most residential subdivisions such problems associated with hillside lots are offset by a view, typically highly valued by the market, but here most views are obscured by trees. The subdivision is served by city water and sewer and underground electric utilities.

The subdivision was originally planned to contain 38 lots plus Tract C, which was an area designed for the construction of condominiums. As of January 1, 1985, the assessment date in question, only six of the lots had been sold. Plaintiff's appraiser testified that, due to the advent of the recession the best use of Tract C would no longer be for condominiums but an additional nine residential lots. Thus, plaintiff views the property in question as consisting of the remaining 32 lots plus nine lots in tract C, or a total of 41 residential lots.

The parties agree that the highest and best use of the land is for single-family residential building sites. Moreover, there is no real disagreement between the parties as to the estimated sale prices of the individual lots. In fact, plaintiff's estimate of the lot prices is higher than defendant's. Plaintiff's appraiser valued 31 of the 41 lots at $14,000 each and 10 of the steeply sloped lots at $8,000 each, for a total "retail" value of $514,000. Defendant's appraiser estimated that eight lots would sell at $14,000, 13 lots at $12,000, 11 lots at $9,000, and Tract C at $16,670, for a total of $383,670. Thus the dispute between the parties is not as to the probable sale prices of the lots.

Both appraisers recognize that escalating interest rates and the ensuing recession depressed the market for residential lots. As disclosed in plaintiff's appraisal report, the market for single-family lots changed drastically as indicated by the single-family building permits issued in the City of Eugene:

| Year | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 |
|------|------|------|------|------|------|------|------|------|------|
| Units | 1207 | 805 | 401 | 206 | 49 | 151 | 70 | 152 | 164 |

Based on this information, plaintiff's appraiser estimates that there are more than 900 lots available in the Eugene area, constituting more than a "30-year supply" at the 1985 absorption rate. Defendant does not dispute that the absorption rate has substantially slowed and affected the value of residential lots. The dispute between the parties revolves around how to measure the effect of the depressed market on that value.

Both parties[1] rely upon a memorandum issued to all county assessors from Ron Walker, Manager of the Appraisal Standards Unit, Urban-Rural Section, Assessment and Appraisal Division of the Department of Revenue, dated April 20, 1983. That memorandum sets forth two alternative methods to use in appraising fully developed subdivision properties. The methods are to be applied to lots held under one ownership which would "require more than one year to sell at prices reflected by current individual lot sales." The first method, referred to as the direct comparison method, ascertains the difference between the sale price of comparable lots sold as a group and the total such lots would have sold for if sold individually. The percentage of difference is then applied to the subject property as a percent of discount. This was the method applied by defendant's appraiser.

The second method described by the memorandum discounts the market value of the subject lots based on the time required to sell all of the lots individually. The discount rate is the market rate applied by investors in the market for purchases of lots as a group rather than individually. This was the method used by plaintiff's appraiser.

---

[1] Although defendant relied upon its interpretation of the Walker memo during trial, in its post trial brief, defendant "abandons reliance on the Walker memoranda for *developed* subdivision property." (Defendant's Closing Brief, at 3.)

The purpose of both methods set forth in the memorandum is the same: to ascertain the true cash value of the lots as a group, as opposed to their individual true cash values. The memorandum recognizes that because of the time value of money, benefits to be received in the future must be discounted to reflect delayed receipt. The memorandum then states:

"In the case of a subdivision, the application of a "discount" or present worth factor for a group of lots under one ownership recognizes the delay in sellout and the cost of holding for a period longer than required for selling an individual lot." (Ex. 3)

This position assumes that multiple lots in one ownership will be sold as a group rather than as individual lots. It also assumes that the objective of the statute is to value the owner's interest in the property. For the reasons set forth below, the court rejects both assumptions.

In this case, we are not faced with the question of whether the subject lots should be assessed as a single parcel. The fact is the lots have been separately assessed. The issue before the court is whether the assessed value of each lot should be discounted or reduced because two or more lots are owned by the same party.

■ The statutes mandate that taxable property be valued at its true cash value, which is defined by the statute to mean "market value." A standard definition of "market value" is:

"Market Value as a basis for true cash value shall be taken to mean the highest price in terms of money which a property will bring if exposed for sale in the open market, allowing a period of time typical for the particular type of property involved and under conditions where both parties to the transaction are under no undue compulsion to sell or buy and are able, willing, and reasonably well informed." OAR 150-308.205-(A).

■ The error of the Walker memorandum and the methods applied by the parties stems from the assumptions noted above. The memorandum assumes that the statutes seek to value the owner's interest. That is not the case. What is being valued is the property, without regard to the form of ownership or the number of ownership interests. The test is not what an owner may realize from his property, but the

value at which the property would change hands in the marketplace. Even limitations or restrictions which are recognized by the market may be ignored for purposes of taxation. For example, uneconomic leases or other "private" restrictions which may drastically affect the market value of the property are ignored for purposes of property taxation. *Swan Lake Mldg. Co. v. Dept. of Rev.*, 257 Or 622, 478 P2d 393, 480 P2d 713 (1971). Therefore, the fact that one or more of the lots may be owned by the same person is irrelevant in determining the market value of each lot. What is relevant and controlling is that the land has been legally subdivided into separate lots and marketed as such. *Penn Phillips Lands v. Dept. of Rev.* 255 Or 488, 468 P2d 646 (1970).

The appraisers are in essential agreement that the "retail" price of a typical lot is $12,000 to $14,000.[2] In order for the court to find a value other than that established by the marketplace, it would be necessary to rely on express statutory direction or authorization. The parties have not cited any because there is none.

The Walker memorandum and both parties appear to assume that all lots held under one ownership, at least contiguous lots, should be valued as a group. However, there is no question that the subject lots are held out for sale on an individual basis as well as a group basis. The evidence indicated that plaintiff has attempted to sell the lots through different marketing techniques and approaches, with no indication that such efforts were limited to group sales. In fact, plaintiff has sold individual lots at "retail" prices.

■■ Perhaps the most compelling reason for rejecting the Walker memorandum is the constitutional requirement of uniformity in taxation. The subject property is a good example. By plaintiff's own testimony, it owns 31 lots valued at $14,000 each. If those lots are discounted to $9,000 each[3], what explanation is to be given to the individual who owns a comparable $14,000 lot? The owner of the single lot may be just as

---

[2] Both appraisers attempt to avoid facing the issue by referring to the admitted market value as a "retail value." Placing a different label on the amount doesn't change the fact that it constitutes market value as defined by ORS 308.205.

[3] Because of the absorption rate plaintiff's appraiser discounted the "retail value" by approximately 81 percent.

anxious to sell as the plaintiff. If the individual's lot is contiguous to one of plaintiff's $14,000 lots, and both lots are listed for sale at $14,000, but plaintiff's lot is assessed at $9,000, there is no uniformity. Neither is there any reasonable explanation which can be given to the owner of the single lot except to say that owners with large holdings are entitled to a discount because they cannot dispose of all of their holdings at once. This position has previously been rejected by this court in *CKW Enterprises v. Dept. of Rev.*, 10 OTR 49 (1985). In that case the court indicated that application of the "developer's discount" should be limited "to those cases where the value sought is the present worth of property which is yet to be developed." (at 51).[4]

■ Having determined that the methods applied by the parties are inappropriate, nevertheless the question is whether all lots should be "discounted" because the period required to sell the property is extraordinary. The county appraiser, Mr. McIntyre, testified that the county applied its "cost to hold" discount against all lots where the owner owned two or more lots. Only individually owned lots were not allowed any discount. However, it appears to the court that the county's discount rate was computed on the basis of group lot sales rather than individual lot sales. The court is unable to find in the record any evidence from which to determine a discount rate for individual lots. Further, the regulation defining market value indicates that the time period (for property to be exposed on the market) is the period "typical for the particular type of property involved." In order for a discount to be applied, there would need to be evidence that the period required to market the subject lots is greater than "typical."

Plaintiff has the burden of proof. Having failed to establish a true cash value lower than those values currently on the roll, the court must sustain the Opinion and Order No. 85-2044. Judgment will be entered accordingly. Costs to neither party.

---

[4] It should be noted that applying a discount factor is only one step in the subdivision approach, which is a cost approach. Hence, it is used where no direct comparable market data exists and there is a "proposed" plan for development. Friedman, *Encyclopedia of Real Estate Appraising*, 662 (3rd ed, 1978).