IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| SCENIC COLD STORAGE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 150188N |
| | ) | |
| v. | ) | |
| | ) | |
| CLACKAMAS COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION** |

This Final Decision incorporates without change the court's Decision, entered

November 13, 2015. The court did not receive a statement of costs and disbursements within 14

days after its Decision was entered. *See* TCR-MD 16 C(1).

Plaintiff appealed the 2014–15 real market value of property identified as Account

05025771 (subject lot). Trial was held in the Oregon Tax Courtroom on July 27, 2015, in Salem,

Oregon, concurrently with *Park Development Inc. v. Clackamas County Assessor*,

TC-MD 150187N, the subject of which was 26 additional lots in the same subdivision as the

subject lot. John Taylor (Taylor), broker, appeared on behalf of Plaintiff and testified.

Plaintiff's president, Michael G. Park (Park), also testified on Plaintiff's behalf. Ronald R.

Saunders (Saunders), registered appraiser, appeared and testified on behalf of Defendant.

I. STATEMENT OF FACTS

The subject lot was one lot out of 27 similar lots (subdivision lots) in a 28-lot industrial

subdivision in Estacada. (Ptf's Ex 1 at 2-3; Def's Ex A at 25.) Park testified that he began

planning the subdivision in 2011 or 2012. He testified that he received a loan for the subdivision

from the State of Oregon in 2013. As of January 1, 2014, all the subdivision lots were improved

with streets and utilities, and one lot was improved with a building. (*Id.*) Most of the lots were

about one acre in size. (*See* Def's Ex A at 14.) The smallest lot was 0.60 acre, and the largest –

Tax Lot 2800, which had the building on it – was 1.51 acre. (*Id.*) The subject lot was 1.35 acres.

(*See* Ptf's Ex 1 at 2.)

Plaintiff bought the subject lot for $308,750 in May 2014. (Ptf's Ex 1 at 2; Def's Ex A at

43.) Two of the other subdivision lots were sold in 2014 after the subject lot, and the remaining

24 were individually listed for sale. (*See* Ptf's Ex 1 at 3; Def's Ex A at 18.) Park testified that

two lot sales were pending as of the trial date. He testified that, in June 2015, he accepted an

offer of $3.50 per square foot for a lot because he needed to make a payment on his loan.

The appraisal reports prepared by Taylor and Saunders each stated that the highest and

best use of the subject lot was industrial.[1] (Ptf's Ex 1 at 2; Def's Ex A at 34.)

A.      *Taylor's Appraisal*

Taylor provided valuations under the captions "cost approach," "market approach," and

"income approach." (Ptf's Ex 1.) He modified each of those approaches by applying discounted

cash flow analysis over the projected absorption period for all the subdivision lots. (*See id*. at 8,

11, 12.) Taylor wrote that his adjustments to value using discounted cash flow analysis were

meant to account for the subject lot's competition with every other lot in the subdivision, which

would "either reduce selling prices or lengthen time to sell." (*Id*. at 4.) Park testified that he

previously developed an industrial subdivision in Estacada and it took approximately nine years

to sell all of the lots. Based on the rate of absorption of Park's last industrial development,

Taylor concluded it would take "about 9 years" for all the subdivision lots to sell. (*Id*. at 5.)

Based on Consumer Price Index data, Taylor calculated a rate of inflation of 2.4 percent per year.

(*Id*. at 10.)

---

[1] At trial, Taylor suggested the subdivision lots might have an "interim" highest and best use; namely, for sale to a developer of industrial sites.

1.      *Cost Approach*

Taylor testified that, under his cost approach, he sought to determine what it would cost to develop a 28-lot subdivision. He wrote that the subdivision lots were developed using state-originated loans totaling $2,825,867, plus engineering and management costs totaling $402,168. (Ptf's Ex 1 at 6.) Taylor testified that, using those two figures, he concluded the direct cost of development was $3,228,035, or $0.99 per square foot. (*Id*.) Taylor testified that he identified four land comparables; they ranged in size from 7.55 acres to 160 acres, in sale date from December 2012 to February 2014, and in sale price per square foot from $0.52 to $2.43. (*See id*.) Taylor testified that he concluded the value of the land throughout the subject subdivision was $1.25 per square foot and, adding the land value to development cost, determined that the "actual cost" of the subdivision lots was $2.24 per square foot. (*Id*. at 7.) He testified that he calculated a developer's profit of $0.95 per square foot. (*See id.* at 9.)

Taylor used discounted cash flow analysis to calculate the entire subdivision's expected profit over the course of a nine-year absorption period. (Ptf's Ex 1 at 8.) He testified that he used nine years based on the time it took Park to sell all of the lots in his previous Estacada subdivision. Taylor applied his projected inflation of 2.4 percent per year and a discount rate of 10 percent. (*Id*.) He testified that he selected a 10 percent discount rate based on "a number of publications" and noted that eight percent is typical for apartments, which are a safer investment than a subdivision. (*See id.* at 9.) Taylor's analysis included projected income from sales of three lots per year, and expenses from holding costs comprising taxes, insurance, maintenance, and management. (*Id*. at 8.) After applying discounted cash flow analysis, Taylor concluded under his cost approach that the subdivision lots had a total present value of $3,699,043, or $3.19

/ / /

per square foot. (*Id.*) He reached a real market value for the subject lot of $187,591 under the cost approach. (*Id.* at 13.)

2.    *Market Approach*

Taylor wrote in his appraisal report that, at the time of trial, the unsold subject lots were listed for sale at $5.00 per square foot. (Ptf's Ex 1 at 9.) He testified that on January 1, 2014, they had been listed for more. Taylor's report listed as comparables the subject lot and two additional subdivision lots, one of which was a sale and the other of which was a listing. (*Id.*) He testified that his first comparable sale was the subject lot itself, a single 1.35-acre lot that sold in May 2014 for $308,750—resulting in a price per square foot of $5.25.[2] Taylor testified that the listing he used as a comparable was a one-acre lot with a price of $5.00 per square foot.[3] (*Id.*) His third sale comprised two tax lots totaling 1.35 acres, which sold in June 2015 for $205,850, resulting in a price per square foot of $3.50. (*Id.*)

Taylor adjusted his comparables for inflation at 2.4 percent per year and he adjusted them for holding time. (Ptf's Ex 1 at 10-11.) Taylor testified that it would take nine years to sell all the lots in the subdivision and, therefore, an average lot could be expected to sell in four and one-half years. (*See id.* at 11.) He wrote that he applied the same discounted cash flow analysis he used for his cost approach, concluding that the present value of the subject lot and the two comparables should be reduced by 32 percent due to the expected time of the sale. (*Id.* at 11.) Taylor's final adjusted comparable values were $3.25 per square foot, $3.40 per square foot, and

/ / /

---

[2] Taylor testified that his appraisal report erroneously listed different data for his first sale. (*Cf.* Ptf's Ex 1 at 9.)

[3] Taylor testified that some of the data for the listing contained in his appraisal report was incorrect. He testified to an acreage differing from the acreage stated in the report, and he confirmed that the price per square foot given in the report was correct. Given that testimony, the "sale price" stated in the appraisal report must be incorrect, but Taylor did not testify to its correct value.

$2.29 per square foot.  (*Id.*)  Taylor testified that he concluded under his market approach that the subject lot had a value of $3.25 per square foot, or $191,120.  (*Id.*)

3. *Income Approach*

Taylor wrote in his report that the subject lot "is not income property in the normal sense."  (Ptf's Ex 1 at 12.)  He wrote that discounted cash flow analysis was, nevertheless, useful to determine the subject lot's value because "if a prospective buyer expressed the idea that he or she might be interested in buying the lot in four or five years, that buyer might be induced to buy if shown that the waiting period would be compensated for."  (*Id.*)  Taylor's income approach used discounted cash flow analysis on a single lot over a 4.5-year period, again with a 2.4 percent inflation rate, a 10 percent discount rate, and expenses for holding costs.  (*Id.*)  Taylor wrote that he concluded a real market value of $3.40 per square foot, or $199,689, under the income approach.  (*Id.* at 12-13.)

4. *Reconciliation*

Taylor wrote that he reconciled his three approaches "[w]ithout pinning a disproportion[ate] amount of weight on any one method * * *."  (Ptf's Ex 1 at 13.)  He testified that he reached a real market value for the subject lot of $194,000.  (*See id.*)

B. *Saunders' Appraisal*

Saunders testified that he prepared an appraisal of the subject lot and rested on his appraisal report.  (*See* Def's Ex A.)  Taylor declined to ask Saunders any questions about his appraisal report and stated that he agreed with Saunders' real market value conclusion, assuming the court accepts Saunders' valuation methodology.

Saunders used the sales comparison approach exclusively to value the subject lot and the 25 subdivision lots without buildings that were under appeal in *Park Development Inc. v.*

*Clackamas County Assessor*, TC-MD 150187N. (Def's Ex A at 61–62.) He concluded that the sale of the subject lot in May 2014 sale at $5.25 per square foot was the best comparable sale. (Def's Ex A at 43–45.) Saunders gave most weight to the sale of the subject lot because it was "located in the subject subdivision and [was] recent in date of sale[.]" (*Id*. at 45.)

In his appraisal report, Saunders identified five other comparable "lot/land" sales, including another one of the subdivision lots that Taylor had identified in his market approach. (Def's Ex A at 43.) Their sale dates ranged from December 2011 to June 2015, their sizes ranged from 40,176 square feet to 170,755 square feet, and their sale prices per square foot ranged from $2.98 to $6.36. (*Id*.) Saunders wrote that 25 of the subdivision lots were listed at $5.50 per square foot on the date of valuation. (*Id*. at 45.)

Saunders wrote that he "did not rely" on his other comparable sale among the subdivision lots—which he reports sold for $4.60 per square foot in June 2015—because "it occurred 18 months after the date of valuation." (Def's Ex A at 45.) He wrote that his other three sales indicated a real market value of "slightly more than $4.62 per [square foot], approximately $4.87 per [square foot], and less than $6.36 per [square foot] in comparison." (*Id*.) Saunders reported that the $5.50-per-square-foot listing price of 25 subdivision lots on the valuation date indicated a real market value of less than $5.50 per square foot. (*Id*.) Saunders concluded under the sales comparison approach that the real market value of all the subdivision lots without buildings was $5.25 per square foot. (*Id*.) He concluded the real market value of the subject lot was equal to its May 2014 sale price of $308,750. (*Id.* at 62.)

## II.  ANALYSIS

The issue in this case is the real market value of the subject lot. At trial, Taylor stated that the parties' disagreement about value arose largely from a disagreement about the valuation

methodology required by ORS 308.205.[4] Taylor stated that Plaintiff would accept Defendant's value if the court found that Saunders' methodology was correct.

The burden of proof falls on Plaintiff, the party seeking affirmative relief from the tax assessment. *See* ORS 305.427. Plaintiff will have proved its case if a "preponderance of the evidence" shows it is entitled to relief. *See id*. Asserted facts are proven by a preponderance of the evidence when they are shown to be "more probably true than false." *Cook v. Michael*, 214 Or 513, 527, 330 P2d 1026 (1958). Ultimately, this court has jurisdiction to determine real market value "without regard to the values pleaded by the parties." ORS 305.412.

ORS 308.205(1) defines real market value for the purposes of tax assessment as follows:

> "Real market value of all *property*, real and personal, means the amount in cash that could *reasonably be expected* to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

(Emphases added.) Taylor reads ORS 308.205(1) as requiring property to be valued at the price for which it could reasonably expected to sell during the tax year.[5] Taylor argues that the real market value of the subject lot can only be found by assuming that all of the subdivision lots will sell during the tax year at issue. Taylor contends that it could not "be reasonably expected" that the subject lot would sell for the same price at which it would sell if it were the only lot sold. (Ptf's Ex 1 at 3-4.) Therefore, each of Taylor's valuation methods uses discounted cash flow analysis to calculate the amount by which the sale price of the subject lot must be reduced in order to reasonably expect to sell it along with all the other subdivision lots in one year.

/ / /

---

[4] Unless otherwise noted, the court's references to the Oregon Revised Statutes (ORS) are to 2013.

[5] Taylor stated his view that the relevant time for the valuation of the subject lots under ORS 308.205(1) was not limited to the assessment date, but included the entire tax year. The court does not adopt Taylor's view on that question, but its analysis of this case is unaffected by it.

Implicit in Taylor's interpretation of a "reasonably * * * expected" sale price under ORS 308.205(1) is an interpretation of the statute's use of the word "property." To be consistent with Taylor's view, the "property" projected to be sold within the tax year must include a group of tax lots, not just one individual tax lot—at least where, as here, each tax lot is a part of a subdivision. If, instead, the "property" of ORS 308.205(1) were one individual tax lot, then that tax lot would have to be valued without assuming the sale of other lots in the subdivision. Therefore, if "property" in ORS 308.205(1) were to refer only to a single tax lot, Taylor's rationale for using discounted cash flow analysis would no longer hold.

The Oregon Supreme Court considered the term "property" as used in ORS 308.205(1) in *First Interstate Bank v. Dept. of Rev.,* 306 Or 450, 453, 760 P2d 880 (1988). The court held that each tax lot in a "fully developed" subdivision—*i.e.*, a subdivision developed with roads and utilities—must be assessed individually. The court's holding was based on reading ORS 308.205 (1981) in the context of other assessment statutes:

> "Based solely on its context within the statute, 'property' could mean tax lot or it could mean a group of tax lots. ORS 308.205, like all statutes, must be read in the context of other statutes. ORS 308.210(2), (3) and (4) provide for the possibilities that properties can be divided and combined. ORS 308.215(1) provides that the assessment roll shall list each *parcel* of real property. We believe that, when taken in the context of these other relevant statutes, ORS 308.205 requires the true cash value of each tax lot to be assessed separately. The value of each lot by itself, not as a portion of a larger piece of property, must be assessed."

*First Interstate Bank*, 306 Or at 453 (emphasis in original). Although ORS 308.205(1) has since been amended to make the standard of valuation "real market value" rather than "true cash value," the other statutes cited by the court still provide for division and combination of properties, and for the listing of parcels on the assessment roll. *See* ORS 308.210(2), (3), (4); ORS 308.215(1). The current context of ORS 308.205(1) therefore still supports the conclusion reached in *First Interstate Bank*. The price to "reasonably be expected" under ORS 308.205(1)

is the price at which one tax lot by itself—not as part of a larger subdivision—would sell on the assessment date.

In the present case, Taylor assigned a value to the subject lot that includes adjustments for the entire subdivision's projected time to sell out. By considering the sale of all the other subdivision lots when valuing the subject lot, Taylor's method fails to value the subject lot separately. *See First Interstate Bank*, 306 Or at 453. Effectively, Taylor's valuation method provides the value of the subdivision to a single owner—or a coordinated group of owners—rather than to the market, and then assigns the subject lot a proportional share of that total "owner value." ORS 308.205(1), in contrast, requires the tax rolls to be set from the market value, "not the market value less a cost to hold." *First Interstate Bank*, 306 Or at 456.

Taylor's appraisal methodology is indistinguishable from the unconstitutional "developer's discount" method, in which the market value of subdivision lots under common ownership is discounted "based on the time required to sell all of the lots individually." *First Interstate Bank v. Dept. of Rev.*, 10 OTR 452, 454 (1987), *aff'd* 306 Or 450, 760 P2d 880 (1988). This court held that a statute requiring valuation using the developer's discount method "directly violates the basic protection afforded by Article I, section 32, of the Oregon Constitution." *Mathias v. Dept. of Rev.*, 11 OTR 347, 352 (1990), *aff'd* 312 Or 50 (1991). The court explained the consequences of setting tax rolls using developer's discount valuation:

> "Property of the same class, *i.e.*, lots in subdivisions, are not subject to uniform taxation. Owners of lots of equal true cash value would not pay taxes on equal values. This is not because the properties are different or are used differently but simply because the owners are different. It is difficult for this court to imagine a more discriminatory scheme."

*Id.*

/ / /

Taylor argued that his appraisal method did not rely on common ownership of the subject lot and the other lots in the subdivision, and provided a hypothetical situation in which a developer died and left the lots to numerous heirs. However, Taylor's discounted cash flow analysis spreads out the adjustments for inflation and holding costs across all of the subdivision lots—a method that does not make sense if each owner is independent. Ultimately, Taylor has not provided market evidence to support his valuation theory. The market evidence before the court—including the sale of the subject lot near the assessment date—supports Saunders' valuation of $5.25 per square foot.

The court has jurisdiction to determine the real market value of the subject lot "without regard to the values pleaded by the parties." ORS 305.412. Taylor stated that if the court disagreed with his appraisal method, he would accept Saunders' valuation. In light of controlling precedent, the court disagrees with Taylor's method. Taylor's method is calculated to reach the value of the subject lot to the owner of all the lots within the subdivision—who must take into account holding costs—rather than the value of the lot to the market as required by ORS 308.205(1). The court accepts Saunders' valuation of the subject lot. Plaintiff's appeal must be denied.

## III. CONCLUSION

After careful consideration, the court finds that Taylor's appraisal method did not arrive at real market value as required by ORS 308.205(1), and the court accepts Saunders' determination of the subject lot's real market value. Now, therefore,

/ / /

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ___ day of December, 2015.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was filed and entered on December 1, 2015.*