Argued and submitted September 5, 1990, the judgment of the Oregon Tax Court affirmed August 29, 1991

Charles J. MATHIAS
and Charlotte Mathias,
*Respondents,*

*v.*

DEPARTMENT OF REVENUE,
*Appellant.*

(OTC 2910; SC S37159)

817 P2d 272

Ted E. Barbera, Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief was Dave Frohnmayer, Attorney General, Salem.

No appearance *contra.*

Willard E. Fox, Salem, filed a brief on behalf of *amicus curiae* Oregon State Home Builders Association.

FADELEY, J.

## FADELEY, J.

Taxpayers complain that their fully developed, vacant residential subdivision lot was valued and taxed at higher amounts than identical lots adjacent to it in the same subdivision. Defendant Department of Revenue does not contest that taxpayers' lot was valued for real property tax purposes at a substantially higher amount than the taxable valuation applied to adjacent lots, or to lots located elsewhere in the same subdivision, or to very similar lots in other nearby subdivisions within the boundaries of the same taxing authority. Instead, the department defends the disparity in taxable value of the otherwise similar, fully developed, vacant lots by relying on a 1989 statutory amendment. The amendment added a new subsection (3) to ORS 308.205, providing that:

> "If the property consists of four or more lots within one subdivision, and the lots are held under one ownership, the lots shall be valued under a method which recognizes the time period over which those lots must be sold in order to realize current market prices for those lots."

Taxpayers allege that the 1989 amendment mandates a "double standard of valuation, for the same class of property (subdivision lots)," thereby violating the rule of uniformity of taxation for the same class of property required by Article I, section 32,[1] and the uniform assessment, levy, and collection required by Article IX, section 1,[2] of the Oregon Constitution. The department and taxpayers filed cross-motions for summary judgment on the constitutional issues thus raised.

The taxable value of taxpayers' lot is based on market value established by comparable sales. Where a single owner held multiple lots, the taxing authorities also started with a value based on the same comparable sales but then substantially reduced that value for tax purposes for all situations in which four or more lots had the same owner. Taxpayers' lot received no reduction from market value. Other lots held in

---

[1] Article I, section 32, provides in part:

"[A]ll taxation shall be uniform *on the same class of subjects* within the *territorial limits of the authority* levying the tax." (Emphasis added.)

[2] Article IX, section 1, provides in part:

"The Legislative Assembly shall * * * provide by law *uniform rules of assessment and taxation*. All taxes shall be levied and collected under general laws operating uniformly throughout the State." (Emphasis added.)

ownerships of one through three lots likewise received no reduction from comparable-sales market value.

Rejecting the department's claim that the disparate valuations were permissible for four or more lots because the disparity was authorized by the numerical-ownership classification in the new statute, the tax court stated:

"The court finds that the statute directly violates the basic protection afforded by Article I, section 32, of the Oregon Constitution. Property of the same class, *i.e.,* lots in subdivisions, are not subject to uniform taxation. Owners of lots of equal true cash value would not pay taxes on equal values. This is not because the properties are different or are used differently but simply because the owners are different. It is difficult for this court to imagine a more discriminatory scheme." *Mathias v. Dept. of Rev.,* 11 OTR 347, 352 (1990).

The tax court entered a declaratory judgment that:

"ORS 308.205(3) violates the uniformity of taxation requirements of Article I, section 32, and Article IX, section 1, of the Oregon Constitution, and is, therefore, null and void."

The issue presented by the department's appeal of the tax court decision is whether the classification attempted — treating four or more lots differently for *ad valorem* tax purposes than one, two, or three otherwise identical lots — is constitutionally permissible. We agree with the tax court that it is not and, therefore, affirm.

## HISTORY OF THE CONTROVERSY
## LEADING TO THIS CASE

The background of this case starts with a memorandum that one of the department's managers sent to county assessors in 1983. The department's 1983 memorandum indicated that a "discount" could be used to reduce the assessed value of two or more fully developed lots in a subdivision, where the lots had a single owner. That memorandum did not require that four or more lots be commonly owned. It did not limit the discount to an original subdivider. It described the reduction or discount method as different from valuation by comparable sales of groups of lots in bulk in one transaction.

The memorandum described the "discount" approach as based on comparable sales of individual lots. The true cash

value of each and every individual lot was first obtained by actual comparable sales. Then, if the assessor estimated that it would take more than one year to sell all of the lots in a multiple-lot ownership, the memorandum permitted a percentage discount to be applied to the true cash value of each lot to reduce taxable value of each and every lot below the value derived from comparable sales. The percentage of reduction was increased to allow for the fact that property taxes were to be paid annually. That is, the reduction or discount as applied offset future taxes that assumedly would be paid on the lot prior to its sale to a new owner. In effect, at least part of the taxes on the lots held in multiple-lot ownership would be shifted onto the individually owned lots.

Thereafter, the tax court limited this so-called developer's discount approach to "those cases where the value sought is the present worth of property which is yet to be developed" and held that "the tax authority has no legal or rational basis for discounting the value of each unit because of who owns the unit." *CKW Enterprises v. Dept. of Rev.*, 10 OTR 49, 51 (1985).

Two years later, the tax court decided another case in which a taxpayer urged that a discount, or calculated cost to hold until sale, should be deducted from market price to reduce taxable value. In *First Interstate Bank v. Dept. of Rev.*, 10 OTR 452, 455 (1987), the tax court stated: "The issue before the court is whether the assessed value of each lot should be discounted or reduced because two or more lots are owned by the same party."

The taxpayer in that case, who was not the original subdivider, but who had come into possession of multiple fully developed lots by foreclosure, relied on the department's 1983 memorandum. The tax court rejected the memorandum and the taxpayer's contentions based on it, stating:

"Perhaps the most compelling reason for rejecting the * * * memorandum is the constitutional requirement of uniformity in taxation. * * * If the individual's lot is contiguous to one of plaintiff's $14,000 lots, and both lots are listed for sale at $14,000, but plaintiff's lot is assessed at $9,000, there is no uniformity." 10 OTR at 456-57 (footnote omitted).

On appeal to this court, the taxpayer argued that the value of the real property, as fixed by the department, was too high because it failed to allow for either a "developer's discount" or a reduction in value for an assumed cost to hold until an undetermined future time when the property might be sold. This court rejected the argument:

"We agree with the Tax Court that the developer's discount is not a permissible method of valuation in the present case. Because we decide that this method of assessment does not comply with statutory requirements, we do not decide whether the application of a developer's discount would result in a violation of Article I, section 32, of the Oregon Constitution.

"* * * * *

"* * * The cost to hold is not different from the rate of return used in the developer's discount method. The true cash value is the market value, ORS 308.205(1), not the market value less a cost to hold." *First Interstate Bank v. Dept. of Rev.,* 306 Or 450, 455-56, 760 P2d 880 (1988).

This court explained:

"The value of each lot by itself, not as a portion of a larger piece of property, must be assessed. [In a footnote the court explained that] [i]n certain situations * * * it would be appropriate to assess that lot based on its value as a part of a group. That is not the situation in the present case." 306 Or at 453 (citation omitted).

This court rejected the taxpayer's argument — that the lots should be lumped together as one unit for valuation purposes — because the lots were fully developed and were on the market individually, concluding that:

"Therefore, this method of valuation does not assess the value of the appropriate unit. Although a separate value is assigned to each lot, this is the value of the lot as a part of the whole, not its value as a separate property." 306 Or at 454.

Turning to a discussion of a separate, adjacent tract owned by the same taxpayer that had not yet been divided into separate lots nor improved with roads and utilities, the court indicated that assessment of the undivided tract as one unit was appropriate. The court explained, as to that tract: "Its undivided status affects its value, but it is that undivided status, not the common ownership, that affects the market value." 306 Or at 456.

After this court's decision in *First Interstate Bank v. Dept. of Rev., supra,* the legislature amended ORS 308.205 by Oregon Laws 1989, chapter 796, section 30, to add a new subsection (3), quoted above. As stated, the department relies on the numerical classification enacted by that amendment to justify the reduced taxable valuation that it has applied only to lots of owners of four or more lots, but not to identical or similar lots when three or fewer lots are owned. In December of 1989, after it had ruled on taxpayers' departmental appeal of the taxable value used for the January 1, 1988, assessment year,[3] the department also promulgated a regulation based on the 1989 amendment that institutionalizes that disparate treatment.[4] The department relied on its regulation, as well as the

---

[3] Oregon Laws 1989, chapter 796, section 32, makes the new subsection (3) applicable to "any appeal pending on March 31, 1989." Taxpayers' appeal of the disparate taxable valuation was pending on that date.

[4] OAR 150-308-205(3) provides in part:

" 'Total unit valuation' means an appraisal concept wherein a group of separately identified properties under one ownership become one 'unit of property' for purposes of determining market value.

"The 'total unit valuation' method of valuing subdivision lots is applicable only when the property is comprised of four or more vacant lots under one ownership in the same fully developed subdivision and the lots are being actively marketed.

"* * * * *

"An estimate of value for a group of lots under the total unit concept shall be accomplished through the use of either of the following methods:

"(a) By direct comparison with sales of groups of lots which are comparable, or adjusted to be comparable, to the subject property in terms of number of lots, market conditions, amenities, and any other factors which may have an influence on market value.

"(b) By use of a 'discount' method to adjust the values indicated by sales of single lots to arrive at an estimate of value for the group of lots comprising the total unit."

An example explaining this "discount" method produces a 29 percent discount; in *First Interstate Bank v. Dept. of Rev.,* 10 OTR 452, 456 n 3 (1987), it appears that the taxpayer's appraiser asserted an 81 percent discount.

Neither the statute nor the regulation limits the "discount" method to multiple-lot ownership by the subdivider or builder. The department's regulation incorporates, as a condition for use of the discount method to lower valuations, the requirement that "the lots are being actively marketed." ORS 308.205(3), on its face, contains no such requirement for enjoying its preferential reduction in valuation.

The rule also provides: "The discount rate * * * includes return on investment and a rate for property taxes." Thus, the rule effectively shifts at least a portion of the already-reduced property taxes paid on the four or more lots onto lots held in ownerships of three or fewer.

The present case does not involve bulk sale of groups of lots under paragraph (a) of the regulation.

statutory changes, to support summary judgment in its favor in the declaratory judgment action now before us. Because the challenged selective reduction in taxable value is now authorized by both statute and regulation, the kind of non-constitutional disposition made by this court in the *First Interstate Bank* case is not possible. We, therefore, turn to a discussion of the meaning of Article I, section 32, in preparation for a decision whether ORS 308.205(3) and the department's implementing regulations violate its commands.

## TAX CLASSIFICATION LAW

In *East Portland v. Multnomah Co.,* 6 Or 62, 66 (1876), commenting on Article I, section 32, in the form then extant, the court focused on the uniformity portion of that provision and stated:

> "The equal and uniform taxation clause has frequently been considered by the courts. The result of the decisions * * * is that the tax must be uniform throughout the taxing district. A state tax is to be apportioned through the state; a county tax, through the county; a city tax, through the city. If the rule of apportionment is uniform throughout the taxing district, the constitutional provision is not violated. The object of the constitutional provision is simply that one proportion of a community shall not be compelled to contribute an unequal share of a fund and a more favored class be proportionally relieved."

Different classifications of property subject to different tax rates were recognized by the court, notwithstanding the "equal and uniform" clause. In *Smith v. Kelly,* 24 Or 464, 33 P 642 (1893), the court said that where all of one distinct class of property is equally assessed in proportion to its value, the fact that another class may be assessed at a different rate is not a violation of this provision.

In 1917, the people amended Article I, section 32, of the Oregon Constitution by deleting the word "equal." That constitutional amendment retained the word "uniform" and added *"on the same class of subjects* within the territorial limits of the authority levying the tax." Or Const, Art I, § 32 (1917) (emphasis added); Carey, A History of the Oregon Constitution

404, 451 (1926).[5] Deletion of the word "equal" authorized tax classifications based on ability to pay, thus facilitating voter enactment of a graduated-rate state income tax. *See Tharalson v. State Dept. of Rev.,* 281 Or 9, 16, 573 P2d 298 (1978); *Standard Lbr. Co. v. Pierce,* 112 Or 314, 335-36, 228 P 812 (1924) (discussing effect of 1917 amendment).

The 1917 amendment confirmed that property could be broken up into rational classes and treated differently class by class. Uniformity of assessment of value and of levy of taxes was still constitutionally required within each class of property within the boundaries of the governmental authority levying the tax.

Interpreting the 1917 amendment soon after its adoption, the court, in *Standard Lbr. Co. v. Pierce, supra,* stated: "[T]he Constitution as amended places no restraint upon the power of the legislature in the matter of taxation * * * with this qualification, * * * that among the members or objects included in a class selected by the legislature, inherent uniformity as well as territorial uniformity is required." 112 Or at 335-36. The *Pierce* court wrote that classification was constitutionally permissible "if some real and substantial distinction is present." *Id.* at 328.

In *State ex rel. v. Malheur County Court,* 185 Or 392, 412, 203 P2d 305 (1949), the court upheld, against a uniformity of taxation challenge, a county-wide tax to pay a share of the cost of a public welfare program mandated by the legislature. All property in the county was taxed at the same rate in relation to its value for the same county-wide benefit. Statewide uniformity of the property tax for public welfare purposes was held not to be necessary. It was sufficient that the tax was uniformly apportioned on the basis of the relative market values of the properties within the boundaries of the county taxing authority.

In *Reynolds Metals Co. v. State Tax Com.,* 227 Or 467, 473, 362 P2d 705 (1961), the taxpayer appealed a valuation of property at a sum that correctly reflected its true cash value. All

---

[5] Before amendment in 1917, the last clause of Article I, section 32, read: "and all taxation shall be equal and uniform."

After amendment, the comparable clause, currently in effect, reads: "All taxation shall be uniform on the same class of subjects within the territorial limits of the authority levying the tax." Or Const, Art I, § 32.

parties agreed that the value placed on the property was its actual value. However, the Board of Equalization granted a 20 percent reduction below true cash value for all other properties within the taxing authority, except for the Reynolds property. Sustaining the taxpayer's position on appeal, this court held that, "[w]here there is a conflict between 'true' value and uniformity of assessment, the requirement of uniformity is paramount." The *Reynolds* court quoted *Appeal of Kliks,* 158 Or 669, 685, 76 P2d 974 (1938), that "[u]niformity is more important to the taxpayer than [accuracy of] appraisal in terms of the correct number of dollars." 227 Or at 473.

In *Penn Phillips Lands v. Tax Com.,* 247 Or 380, 385-86, 430 P2d 349 (1967), the court held that discrimination in enforcement of tax laws by applying current market price to establish taxable value of one parcel while applying out-of-date, lower prices to establish taxable value for other adjacent parcels "offends the uniformity clauses of our own constitution. Oregon Constitution, Art I, § 32, Art IX, § 1."

Our more recent cases continue the requirement that a classification, to survive the protections of the uniformity in taxation clauses of the state constitution, must be based on real differences between the subjects disparately treated by the classification. A sampling of those cases follows.

"[W]e conclude that a classification * * * is * * * *constitutionally permissible if it is also based upon qualitative differences.* * * * This requirement is based upon the principle established in our previous decisions that a tax classification is constitutionally valid *if it rests upon genuine differences. See Huckaba v. Johnson,* [281 Or 23, 25-26, 573 P2d 305 (1978),] (citing cases)." *Jarvill v. City of Eugene,* 289 Or 157, 180, 613 P2d 1 (1980) (emphasis added).

"In *Dutton Lbr. Corp. v. Tax Com.,* 228 Or 525, 365 P2d 867 (1961), we set forth the applicable principles:

" "* * * [I]f the classification is reasonable, not arbitrary and rests upon some ground of difference having a fair and substantial relation to the object of the legislation, so that persons similarly situated shall be treated alike. * * *"

"* * * It, however, is not sufficient to merely point out differences between the groups of taxpayers for divergent treatment. The differences justifying the attempted classification must bear a reasonable relationship to the legislative purpose." *Huckaba v. Johnson,* 281 Or 23, 25-26, 573 P2d 305 (1978).

In *Robinson v. State Tax Com.*, 216 Or 532, 536, 339 P2d 432 (1959), we stated:

> "Thus several methods might be used to determine true cash value, but irrespective of the method used, true cash value is one of the basic rules of assessment. * * * [I]f the assessment is reasonably proportionate to assessed valuation of similar properties in the county, the assessment does not violate any constitutional or statutory provisions." (Emphasis added.)

■        From the foregoing discussion, some principles concerning the uniformity clause emerge. The legislature may divide different property subjects into different classes on a rational basis, and different classes may be treated differently. However, valuation methods and tax rates must be uniform within "the same class of subjects" of *ad valorem* taxation throughout a taxing authority. Classifications, to pass state constitutional muster, must be based on inherent, qualitative, genuine, rational differences between the classes of property to be accorded different treatment. With those principles in mind, we turn to the decision of this case.

## DEPARTMENT'S CONTENTIONS

### A. *Asserted Basis for Classification*

■        The department contends that there is a "rational basis" for the numerical classification in ORS 308.205(3) because other statutes, not directly concerned with taxation, distinguish between division of a larger parcel into four or more lots as compared with division of a parcel into three or fewer lots. The department makes no other contention designed to disclose a difference between those individual lots granted a tax break and those denied it.

The department asserts that, because the legislature made a numerical classification in the land division context, there is a rational basis for making the same numerical division for purposes of valuation for taxation. The department cites *Dutton Lbr. Corp. v. Tax Com.*, *supra*, 'to support the proposition that a legislature has "wide discretion as to classification." Without questioning the accuracy of that proposition in the abstract, we note that the *Dutton* court, considering a corporation excise tax question, required for its application that the classification be based upon distinctions "reasonably related to

the object of the legislation" so that taxpayers "similarly situated shall be treated alike." 228 Or at 539-40.

ORS 92.010(7) labels the process of dividing land into two or three parcels, within one calendar year, *as to "partition land,"* while ORS 92.010(13) labels the process of dividing land "into four or more lots within a calendar year" *as to "subdivide land."*[6] Both partitioning and subdividing are, however, subject to identical or nearly identical regulatory requirements. For example, recorded plats of the land division are required whether the process was labeled a partition or a subdivision. ORS 92.010(8); ORS 92.040. ORS 92.017 provides:

> "A lot or parcel lawfully created shall remain a discrete lot or parcel, unless the lot or parcel lines are changed or vacated or the lot or parcel is further divided, as provided by law."

These regulatory provisions do not relate to taxation and, thus, are not themselves within the scope of the uniformity in taxation mandate of Article I, section 32. Land division regulations are, therefore, not directly subject to Article I, section 32. Their existence does not provide a rational basis for a tax law classification distinguishing three or fewer lots from four or more. Moreover, in the statutory parlance, only where a subdivision is involved are individual tracts of land resulting from the division properly denominated "lots." ORS 92.010(1). If that parlance is used in parsing ORS 308.205(3), it simply reinforces the sameness of the favored and the disfavored parcels — all are, identically, "lots" in subdivisions, not properties of inherently different kinds or uses.

There is no rational basis for disparate tax treatment based on this contention. It is the only basis on which the department claims that a valid classification was legislatively attempted. A close examination of legislative history confirms that the land division statutes were the only source of the

---

[6] The department does not contend that the reason for classifying a division of land into three parcels as *partitioning* but into four parcels as *subdividing* bears any relation to a reason for a similar numerical classification for tax valuation purposes.

No party contends that the real property valuation is to be on any basis other than the highest and best use permitted by law or that ORS 308.205(3) modifies that principle. As *amicus* points out in its brief:

"ORS 308.205(3) does not change the subject or basis of the tax, *i.e.* 'true cash value' or 'market value' of the property as of the assessment date."

attempted numerical classification excluding three but including four.[7]

Even if one assumes that there is some regulatory reason for treating a division of land into four tracts in one calendar year differently than a division into three, that rationale, when borrowed and transferred to an *ad valorem* tax setting, would not necessarily override the constitutional requirement for uniformity in that taxation context. Were it otherwise, a statutory "classification" of a general subject matter for any purpose could render ineffective all uniformity of taxation constitutional protections where that general subject matter was involved.

In sum, the only distinction of moment provided by the division between three or fewer and four or more in the borrowed statute is one of labels — "partition" and "parcel" are nomenclatures applied to divisions of land into three or fewer pieces in one year, while "subdivide" and "lot" are applied to divisions of land into four or more pieces in one year. That distinction is without a real difference in effect, purpose, or relation to the single class of taxable subjects created by dividing larger parcels of land into smaller ones and then fully developing them for residential purposes, where the individual lots thereafter are assessed and taxed separately. The amount of other property that a taxpayer owns is not a rational basis for distinguishing between otherwise identical lots for tax purposes.[8] The classification accordingly lacks the inherent,

---

[7] *See* Minutes, House Revenue and School Finance Committee, April 5 and 6, 1989; Minutes, General Government Subcommittee, Joint Ways and Means Committee, June 23, 1989. Ironically, the original proposal for legislation which became ORS 308.205(3) would have covered all lots in subdivisions that "will require more than one year to sell at prices reflected by current lot sales." The four-or-more distinction was suggested later by the department. No reasoning for selecting the number of four lots as the point of beginning favoritism was articulated other than that it was a number already in the "land use laws." Other land use laws use other numbers of lots as dividing lines. *See* ORS 92.375 (ten lot dividing line used).

[8] Classifications for property tax purposes based purely upon characteristics of the owner have been declared invalid in *Redfield v. Fisher*, 135 Or 180, 292 P 813, 295 P 461 (1931), and *In re Opinion of the Justices*, 84 NH 559, 569, 149 A 321, 326, 330 (1930). *See also CKW Enterprises v. Dept. of Rev.*, 10 OTR 49, 51 (1985) (no rational or legal basis for disparate treatment based on "who owns the unit").

If a governmental unit levies $1,000 in taxes and there are ten similar lots within the boundaries of the unit, each lot would pay $100. But if five of the lots are in a single common-ownership and receive a 30 percent "discount," each of those five lots pays less. In this hypothetical, taxes levied on identical lots would vary by over 40 percent.

qualitative, genuine difference between the subjects required under Article I, section 32.

The dissent asserts that there is a constitutionally significant difference between three lots as opposed to four otherwise identical lots. The dissent does not supply a statement of that difference. Instead, in support of this assertion, the dissent first chides the court for lack of deference to another branch of government. Where deference cannot reasonably be paid to both the constitution and the acts of another branch of government reviewed in context of the constitution, courts have the responsibility to enforce the constitution.

The dissent also ignores the effect of supply and demand on establishing prices of all similar items falling within a given market. Moreover, there exists no likelihood that any one particular lot will sell before any other lot that is otherwise identical, where all are offered at the same price. In that circumstance, applying a time element to one lot but not to another requires an arbitrary assumption about which lot or lots will sell first. No qualitative or genuine rational basis of classification arises from an arbitrary assumption.

The remainder of the dissent glosses over the fact that the difference between partitioning and subdividing in ORS chapter 91 is a distinction in labels only and that, in any event, all parcels in this case are subdivision lots. Authorities cited by the dissent do not support the conclusion for which they are cited because the authorities require that a classification, to be valid against the uniformity of taxation clauses, must be based on a qualitative, genuine difference.

Authorities bottomed on federal equal protection cases, also cited to save the attempted classification here, fare no better. For example, *Huckaba v. Johnson, supra,* 281 Or at 25-26, analyzing federal equal protection guarantees, cites a decision of the Supreme Court of the United States dealing with complete exemption of some employers from a state payroll tax. The classification of employers between those taxed and those exempted was upheld against the equal protection challenge by finding two rational bases for the classification: administrative cost to the state to tax smaller employers could dissipate the amount of tax collected from them, and a difference in the kinds

of employers taxed from those exempted.[9] No one contends that either basis would apply to take these nearly identical lots out of the uniformity protections for "the same class" of subjects.

A later decision of that Court, striking down a state tax classification for exemption purposes where more specific federal constitutional provisions were involved, indicates that deference to state classifications has, even in the federal scheme, significant limits.

> "Even assuming the State's estimate of the relative value of state and federal retirement benefits is generally correct, we do not believe this difference suffices to justify the type of blanket exemption at issue in this case. While the average retired federal civil servant receives a larger pension than his state counterpart, there are undoubtedly many individual instances in which the opposite holds true. A tax exemption truly intended to account for differences in retirement benefits would not discriminate on the basis of the source of those benefits, as Michigan's statute does; rather, it would discriminate on the basis of the amount of benefits received by individual retirees. *Cf.* Phillips Chemical Co., supra, at 384-385, 4 L Ed 2d 384, 80 S Ct 474 * * *." *Davis v. Michigan Dept. of Treasury,* 489 US 803, 817, 109 S Ct 1500, 103 L Ed 2d 891, 906 (1989).

That Court has also held that intentional, systematic undervaluation of comparable neighboring properties by state officials while assessing others at full value violated the equal protection clause of the Fourteenth Amendment. *Allegheny Pitt. v. Webster County,* 488 US 366, 109 S Ct 336, 102 L Ed 2d 688 (1989). *See also Williams v. Vermont,* 472 US 14, 105 S Ct 2465, 86 L Ed 2d 11 (1985) (tax credit allowed to Vermont residents for sales tax paid on some automobiles purchased out-

---

[9] In *Carmichael v. Southern Coal & Coke Co.,* 301 US 495, 511-12, 57 S Ct 868, 81 L Ed 1245, 1254 (1937), the Supreme Court of the United States explained:

"It would hardly be contended that the state, in order to tax payrolls, is bound to assume the administrative cost and burden of taxing all employers having a single employee. But if for that or any other reason it may exempt some, whether it should draw the line at one, three, or seven, is peculiarly a question for legislative decision. The decision cannot be said to be arbitrary because it falls in the twilight zone between those members of the class which plainly can and those which plainly cannot expediently be taxed.

"* * * The character of the exemptions suggests simply that the state has chosen, as the subject of its tax, those who employ labor in the processes of industrial production and distribution."

of-state, but not allowed if purchased before the buyer became a Vermont resident, held violative of federal equal protection).

B. *Asserted Intent to Foster Subdivision Development*

■ The department and *amicus* contend, along with the dissent, as an alternative to the argument that the numerical classification is valid, that the legislature intended to encourage investment and effort by those engaged in subdividing land by providing them a tax incentive or subsidy. They argue that ORS 308.205(3) is, in reality, a form of partial property tax exemption designed to stimulate subdividers into more activity than market forces alone would produce. They cite other "exemptions" — such as special assessment of land dedicated to farm use, the exemption of property that is held for sale as inventory of a business, and the exemption of commercial facilities while under construction — as proof of the legislature's intent to subsidize larger landowners when it adopted ORS 308.205(3). Those other exemptions are, of course, based on differences in kind or in the only permitted use of the exempted property. *See* Etter, *Municipal Tax Differentials,* 37 Or L Rev 1, 43 (1957) (discussing distinctions based on kind or use of land).

In response to the department's argument, the tax court pointed out that the benefits of the statute are not limited to subdividers or developers or to property being developed. Neither the statute at issue nor the department's application of a discount to the market value of some of the lots under consideration limits use of the tax valuation method favoring multiple ownerships either to such ownerships still held by the original subdivider or to bulk sales of subdivision lots.

The fact that the exemption would not necessarily achieve the goal which the department's contention assigns to it does not alone mean, however, that the legislature did not intentionally establish an exemption from which only owners of four or more lots would benefit. Therefore, we carry consideration of the intended-tax-benefit argument a bit further.

Nothing in the text of the statute or in the department's implementing regulation suggests that a partial exemption from otherwise justly due taxes is intended. The statute and regulation describe only a method of reducing taxable value for selected lots below the established market value of those

lots, a method that is not uniformly applicable under the statute to all similarly situated lots. Neither the statute nor the regulation parallels the form or content of the other exemption statutes cited in the department's argument. There is no difference in kind or in use of the property on which to base a selective exemption. There simply is no indication that the legislature intended to require other taxpayers to pay a part of a subdivider's property taxes. Instead, the text of the statutory subsection at issue in this case confirms that all taxpayers are intended to be taxed on actual market value. Moreover, no amendment or other reference to the mandate of ORS 308.232[10] occurs in the legislation or in the history of its consideration.[11]

The context of the statute does not indicate that exceptions or tax benefits for individual landowners were under consideration. HB 2338 (1989 Legislative Assembly), to which subsection 3 was added by amendment in committee, focused on achieving uniformity of true cash valuation and assessment.

Lastly, nothing in the legislative history supports reading the statute as a consciously enacted exemption, tax benefit, or subsidy. The recorded discussion is but an argument that a more accurate current assessed value will be obtained by applying this method to individual lots that may, arguably, take some time to sell, augmented by the observation that use of the method had been standard practice (for the few years after it first appeared in the 1983 memorandum of the department and before it was upset by this court's decision in *First Interstate Bank v. Dept. of Rev., supra*). This discussion, and that practice, did not illuminate further why three or fewer residential lots are inherently different than four or more lots for *ad valorem* tax assessed value purposes, nor why one individual lot would take longer to sell than any other similar lot. Indeed, comments of committee staff to the Ways and Means Subcommittee members disclosed awareness of the potential that the act might be

---

[10] ORS 308.232 provides:

"All real or personal property within each county shall be valued and assessed at 100 percent of its true cash value." (1991 amendments to ORS 308.232 change "true cash" to "real market" value. Or Laws 1991, ch 459, § 97.)

[11] Were we to accept the invitation of the department (and the dissent) to construe the statute as one granting exemption for some but not all otherwise similar residential lots, it is not readily apparent that the uniformity of taxation issues present in this case would be avoided.

unconstitutional for lack of a rational basis for the purely numerical classification, but recommended that the committee include section 30 in HB 2338, enabling the "standard practice" based on the 1983 memorandum to continue while deferring the constitutionality decision to the courts. Tape recording, General Government Subcommittee, Joint Ways and Means Committee, June 23, 1989, side 134-B at 210.

The argument that the legislature intended partial exemption or subsidy for those owning four or more lots at the expense of other property taxpayers, including those owning fewer lots, is not supportable. It cannot validate the attempted numerical classification granting a reduction from true cash value for only those lots presently held in ownerships of four or more in a single subdivision.

## CONCLUSION

ORS 308.205(3) violates the uniformity requirements of Article I, section 32, of the Oregon Constitution.[12] The judgment of the tax court is affirmed.

**VAN HOOMISSEN, J.,** dissenting.

I respectfully dissent. I would hold that ORS 308.205(3) does not violate the uniformity requirements of Article I, section 32, of the Oregon Constitution.

The legislature had a rational basis for concluding that "holding time" or "time-for-sale" affects the market value of property, entitling the owner to differentiated valuation methods that recognize such factors in the property's assessment value. The decision to draw the line at "four or more lots under one ownership" is not arbitrary. This unique tax treatment was intended to benefit those who are in the business of subdivision. It was appropriate for the legislature to define the tax class of ownership covered by the measure in the same terms as the subdivision statutes, which have a similar rationale.

---

[12] Because this case is decided under Article I, section 32, we do not further consider the question under Article IX, section 1. However, we do not mean to imply that, reading the sections together, the result would differ under an analysis of that section.

## DEFERENCE TO LEGISLATIVE ACTION

This case involves this court's relationship to, and respect for, a coordinate branch of government. This court traditionally has given great deference to the legislature in its judgments and determinations. We have expressed a strong reluctance to find statutes to be unconstitutional. We also have stated that we should indulge every presumption in favor of validity and declare no act of the legislature void unless its invalidity is shown beyond a reasonable doubt. *State v. Anthony,* 179 Or 282, 301, 169 P2d 587 (1946). In my view, the majority has not followed these rules in this case. The majority has not overcome the presumption that ORS 308.205(3) is valid. The majority has not looked hard enough to discern a rational, non-arbitrary basis for the legislature's conclusion that the true cash value of one class of property should be calculated in a manner which is different from the manner in which the true cash value of a different class of property is calculated.

## CONSTITUTIONAL HISTORY

In 1917, the people inserted the phrase "all taxation shall be uniform on the same class of subjects" into Article I, section 32, of the Oregon Constitution.[1] Before 1917, Article I,

---

[1] Preliminarily, it should be noted that there is but one necessary constitutional analysis to determine the validity of ORS 308.205(3). Taxpayers argue that both Article I, section 32, and Article IX, section 1, of the Oregon Constitution are violated by the taxing scheme at issue. Article I, section 32, provides in part:

"[A]ll *taxation shall be uniform on the same class of subjects within the* territorial limits of the authority levying the tax."

Article IX, section 1, provides in part:

"The Legislative Assembly shall * * * provide by law uniform rules of assessment and taxation. All taxes shall be levied and collected under general laws operating uniformly throughout the state."

The majority holds that the legislative classification at issue here is void because it violates Article I, section 32. Because it decides this case under Article I, section 32, it does not further consider the question under Article IX, section 1. This implies that a separate analysis may be required under Article IX, section 1, if the statute at issue is found to be consistent with Article I, section 32. That implication, however, is inconsistent with our case law which expressly states that Article I, section 32, and Article IX, section 1, are to be read together. *Jarvill v. City of Eugene,* 289 Or 157, 171 n 15, 613 P2d 1 (1980); *State ex rel. v. Malheur County Court,* 185 Or 392, 411, 203 P2d 305 (1949). For purposes of this case, the analysis under both provisions is the same, because, read together, both provisions permit the legislature to classify the subjects of taxation. *Knight v. Dept. of Revenue,* 293 Or 267, 271, 646 P2d 1343 (1982).

section 32, required that "all taxation shall be equal and uniform." The pre-amendment language was construed to require that the rate of taxation "be absolutely equal upon all property of whatever kind * * * [and] property was required to be valued and taxed at equal rates." *Standard Lbr. Co. v. Pierce,* 112 Or 314, 334, 228 P 812 (1924).

The 1917 constitutional amendment permitted "classification of property in respect to its nature, condition or class, and the imposition thereon of different rates of taxation upon different classes of property." *Id.* at 335. In fact, "the primary purpose of the 1917 amendment was to permit classification." *Jarvill v. City of Eugene,* 289 Or 157, 177, 613 P2d 1 (1980). "This power to classify includes the authority to subclassify persons included in the general class." *Id.* at 183. In addition to allowing classification for different rates of taxation, the amendment also allowed taxing authorities to classify property and impose different methods of valuation on the classes of property. *Robinson v. State Tax Com.,* 216 Or 532, 536, 339 P2d 432 (1959).

The power to make classifications of property for taxing purposes is solely in the hands of the taxing authority, in this case the legislature. *See Standard Lbr. Co. v. Pierce, supra,* 112 Or at 336 ("among the members or objects included in a class selected by the legislature, inherent uniformity as well as territorial uniformity is required"). The legislature has wide discretion in the exercise of its power to create tax classifications. *Knight v. Dept. of Revenue,* 293 Or 267, 271, 646 P2d 1343 (1982); *Jarvill v. City of Eugene, supra,* 289 Or at 178; *Huckaba v. Johnson,* 281 Or 23, 25, 573 P2d 305 (1978); *Dutton Lbr. Corp v. Tax Com.,* 228 Or 525, 539, 365 P2d 867 (1961).

## CLASSIFICATION

The discretion to classify and to subclassify, however, is not unfettered. A classification must have a "rational basis." In *Huckaba v. Johnson, supra,* this court stated:

"What is required in assessing a constitutional challenge to classification for tax benefit is a review of the grounds for the classification to determine if it rests upon a rational basis. The legislature may make distinctions of degree having a rational basis, and when subjected to judicial scrutiny they must be presumed to rest on that basis if there is any conceivable state of facts which would support it. It, however, is not sufficient to

merely point out differences between the groups of taxpayers for divergent treatment. The differences justifying the attempted classification must bear a reasonable relationship to the legislative purpose." 281 Or at 26 (citations omitted).

Moreover, once the legislature has created a rational classification, the tax must be uniform within that classification. Or Const Art I, § 32.

The majority perverts this rational basis standard of review. In rejecting potential bases for the classification at issue, the majority repeatedly refers to the legislative history of the 1989 amendment adding subsection (3) to ORS 308.205. For example, the majority makes such statements as:

"A close examination of legislative history confirms that the land division statutes were the only source of the attempted numerical classification excluding three but including four." 312 Or at 61-62.

"There simply is no indication that the legislature intended to require other taxpayers to pay a part of a subdivider's property taxes." 312 Or at 66.

"[N]othing in the legislative history supports reading the statute as a consciously enacted exemption, tax benefit, or subsidy." 312 Or at 66.

This focus on the legislative history of the provision at issue to determine that provision's validity is a sharp break from the traditionally deferential level of review provided to this category of legislation. In our review of such legislation in the past, we have looked to the standard, quoted above, in *Huckaba v. Johnson, supra,* that the validity of the legislation must be sustained if there is any conceivable rational basis to support it. In contrast, in the past, we have rejected the view that we look to only those bases which are clearly articulated and dutifully recorded in the legislative history. In reviewing the legislation in this case the majority should be asking the question, "Could the legislature enact this statute as an exemption, tax benefit, or subsidy," not whether such an intent is clearly expressed in the legislative history.

By ignoring potential rational bases that the legislature could have considered (not necessarily did consider), the majority is applying a standard of review far more rigorous than our traditional test requires in these taxation cases. In my view,

it is "conceivable" that the legislature enacted this provision on one or more of the grounds pointed to by the majority. Any such ground, moreover, would also be rational, at a minimum, as an aid to the benefited industry, *i.e.,* economic development.

## A. *Rational Basis for Classification*

This case involves a legislative classification of property on which a unique method. of valuation is imposed. In general, all property, real or personal, is required to be valued and assessed at 100 percent of its true cash value. ORS 308.232. Before 1989, "true cash value" was defined:

"True cash value of all property, real and personal, means the market value of the property as of the assessment date. True cash value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue and in accordance with the following:

"(1)   If the property has no immediate market value, its true cash value is the amount of money that would justly compensate the owner for loss of the property.

"(2)   If the property is subject to governmental restriction as to use on the assessment date under applicable law or regulation, true cash value shall not be based upon sales that reflect for the property a market value that the property would have if the use of the property were not subject to the restriction unless adjustments in value are made reflecting the effect of restrictions." ORS 308.205 (1987).

In 1989, the legislature amended the definition of true cash value by adding the so-called "developer's discount." Or Laws 1989, ch 796, § 30. That provision provides:

"(3)   If the property consists of four or more lots within one subdivision, and the lots are held under one ownership, the lots shall be valued under a method which recognizes the time period over which those lots must be sold in order to realize current market prices." ORS 308.205(3).

With the implementation of the "developer's discount," the legislature exercised its power under Article I, section 32, to create a classification of real property and impose a method of valuation on that class that differs from the method of valuation for other kinds of real property.[2] *See Robinson v.*

---

[2] The department first recognized the "developer's discount" in 1983. In *First Interstate Bank v. Dept. of Rev.,* 306 Or 450, 760 P2d 880 (1988), however, this court

*State Tax Com., supra* (different methods of valuation legitimate for different classes of property).

In my opinion, there is a rational basis on which the legislature could have determined that the class selected was unique and worthy of unique tax treatment. The legislative classification is based on "inherent, qualitative, genuine, rational differences between the classes of property to be accorded different treatment." 312 Or at 60.

The legislative history of ORS 308.205(3) and the plain language of the statute reveal the basis on which the classification in the statute was authorized by the legislature, *i.e.,* the effect of holding-time on the market value of certain property. The assumption behind the classification is straightforward and is backed by common sense and experience. It takes longer to sell four or more lots than it does to sell three or fewer. The legislators were apprised of this reality. For example, the attorney for the Oregon Homebuilders Association and original author of the amendment explained to the Senate Committee on Revenue and School Finance:

> "So what we're attempting to recognize here is that when the single lot owner sells, he gets $14,000. When the owner of 31 sells, he gets only $9,000 per lot, and that's looking to the market." Testimony of David Carmichael, Senate Committee on Revenue and School Finance (SB 2338), May 24, 1989, Tape 166, Side B, Cue No. 354.

In its review of the legislative history, the majority notes:

> "The recorded discussion is but an argument that a more accurate current assessed value will be obtained by applying this method [of valuation] to individual lots that may, arguably, take some time to sell * * *." 312 Or at 66.

The valuation method eventually implemented was adopted to expressly recognize "the time period over which those lots must be sold in order to realize current market prices." ORS 308.205(3). The effect of holding-time on the market value of

---

held that ORS 308.205, as it then existed, did not permit the department to use the "developer's discount" for property tax valuation. In response to this court's decision in *First Interstate Bank,* the 1989 legislature amended that statute, giving the department specific authority *to continue* its former practice. Thus, the legislative history leaves no doubt but that the legislature specifically intended to authorize the "developer's discount" at issue in this case.

certain property is at least one basis on which the legislature could rationally create a classification.

The department argues in its brief that, generally, lots in a given subdivision will be of relatively uniform size, and it is reasonable to conclude that the aggregate size of four or more lots will be greater than three or fewer. Assuming this to be true, the legislature also could have concluded that the market value of a large piece of "property consisting of four or more lots within one subdivision, under one ownership," may be different than a smaller piece of property and, therefore, would require a unique method of valuation. For example, this court has also recognized distinctions in the marketability of larger and smaller parcels of land. *See, e.g., Ward v. Dept. of Revenue,* 293 Or 506, 510, 650 P2d 923 (1982) ("The market value of a large parcel does not necessarily equal the sum of the market value of the parts into which that parcel may be divided or subdivided because smaller parcels may be more readily marketable").

## B. *Reasonable Relationship to Permissible Objective*

The majority never evaluates the effect of holding-time on the market value of certain property as a conceivable state of facts supporting a classification of that property for differentiated tax treatment. Is not "a more accurate current assessed value" a permissible legislative objective? Why may the legislature not rationally determine that a certain class of lots does, in fact, take longer to sell and, thus, requires unique tax treatment? Why does the statute not reasonably relate to the legislative goal?

The legislature was careful in deciding that property consisting of four or more lots in single ownership in one subdivision is the type of property which is entitled to a differentiated method of valuation for tax purposes. As the majority correctly states, the number "four or more" was not "drawn out of a hat." Whether or not property consists of four or more lots is the initial dividing line between whether the property is, or is not, a subdivision. ORS 92.010(13); 92.010(14). If a piece of property consists of four or more lots, then that property is subject to subdivision laws and regulations. That is why the legislature drew the line where it did. The classification bears a reasonable relationship to the end it sought to achieve.

The majority understands the department's argument that the legislature "borrowed" the number "four or more" from the subdivision statute to be: "What number shall we use? Well, we used the phrase 'four or more' in the subdivision law and that number seems to work there, so we might as well use it here." The majority then reasons that just because the number "four or more" is good for one purpose does not mean that it is good for another. The majority misunderstands the department's argument. The department does not argue that the number was merely borrowed from the subdivision laws, and that any number is as good as any other. Rather, the department argues that the legislature specifically chose that number because it was used in the subdivision laws, *i.e.,* that there was a direct relationship between the number used in the subdivision laws and its use in the 1989 statutory amendments. Minutes, House Committee on Revenue and School Finance, April 6, 1989, at 5; Tape 81, Side B, Cue No. 261.

The legislature easily could have concluded that the tax treatment of property in a subdivision might influence the development of subdivisions. For example, a land developer contemplating a decision to subdivide a parcel of land (create four or more lots) inevitably is faced with the prospect of paying taxes on that subdivision. Without the tax treatment of a subdivision (four or more lots) provided for in ORS 308.205(3), if the developer decides to subdivide (create four or more lots), the developer will be forced to pay taxes on the retail value of each individual lot while it is being held for sale. That developer might conclude that it is not economically feasible to subdivide (create four or more lots) the property. The legislature rationally could conclude that that would have undesirable economic impacts for the state. In short, the legislature had a rational reason for granting differentiated tax treatment for property consisting of four or more lots within one subdivision under one ownership, as is permitted by the 1989 amendments to ORS 308.205.

The process of subdivision development typically results in smaller parcels with a greater aggregate taxable market value than the original large, undivided parcel. *See Ward v. Dept. of Revenue, supra,* 293 Or at 510. The legislature reasonably could have recognized the ultimate tax benefits accruing to the state from the process of subdivision and could

reasonably have chosen to facilitate the process by recognizing pre-sale holding costs in the tax valuation system.

The majority notes that the subdivision laws

"do not relate to taxation and, thus, are not themselves within the scope of the uniformity in taxation mandate of Article I, section 32. Land division regulations are, therefore, not directly subject to Article I, section 32." 312 Or at 61.

Whether the subdivision laws are subject to Article I, section 32, however, is of no consequence. The question at issue is whether the legislature had a rational basis for creating a classification that is subject to Article I, section '32. For the reasons noted above, I believe that it did. The classification contained in ORS 308.205(3) is rationally based and is reasonably related to a permissible legislative objective. Therefore, the classification is valid.

Carson, J., joins in this dissent.