IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| PARK DEVELOPMENT INC., | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 150187N |
| | ) | |
| v. | ) | |
| | ) | |
| CLACKAMAS COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION** |

This Final Decision incorporates without change the court's Decision, entered

November 13, 2015.  The court did not receive a statement of costs and disbursements within 14

days after its Decision was entered.  *See* TCR-MD 16 C(1).

Plaintiff appealed the 2014–15 real market values of 26 property tax accounts, identified

as Accounts 05025759 through 05025770, Accounts 05025772 through 05025777, and Accounts

05025779 through 05025786 (subject lots).  Trial was held in the Oregon Tax Courtroom on

July 27, 2015, in Salem, Oregon, concurrently with *Scenic Cold Storage*, *LLC v. Clackamas

County Assessor*, TC-MD 150188N, the subject of which was a lot in the same subdivision as the

subject lots.  John Taylor (Taylor), broker, appeared and testified on behalf of Plaintiff.

Plaintiff's president, Michael G. Park (Park), also testified on Plaintiff's behalf.  Ronald R.

Saunders (Saunders), registered appraiser, appeared and testified on behalf of Defendant.

I.  STATEMENT OF FACTS

The subject lots were 26 of 27 similar lots (subdivision lots) in a planned industrial

subdivision in Estacada.  (Ptf's Ex 1 at 2; Def's Ex A at 14.)  Park testified that he began

planning the subdivision in 2011 or 2012.  He testified that he received a loan for the subdivision

from the State of Oregon in 2013.  As of January 1, 2014, all the subdivision lots were improved

with streets and utilities, and one lot was improved with a building. (*Id.*) Most of the lots were about one acre in size. (*See* Ptf's Ex 1 at 15; Def's Ex A at 14.) The smallest lot was 0.60 acre, and the largest—Tax Lot 2800, which had the building on it—was 1.51 acre. (*Id.*)

The subdivision lots were individually listed for sale. (Ptf's Ex 1 at 3; Def's Ex A at 18.) Taylor wrote in his appraisal report that three of the subdivision lots had sold subsequent to the appraisal date. (Ptf's Ex 1 at 4.) Park testified that two lot sales were pending as of the trial date. He testified that, in June 2015, he accepted an offer of $3.50 per square foot for a lot because he needed to make a payment on his loan.

The appraisal reports prepared by Taylor and Saunders each stated that the highest and best use of the subdivision lots was industrial.[1] (Ptf's Ex 1 at 2; Def's Ex A at 34.)

A.     *Taylor's Appraisal*

Taylor provided valuations under the captions "cost approach," "market approach," and "income approach." (Ptf's Ex 1.) He modified each of those approaches by applying discounted cash flow analysis over the projected absorption period for all the subdivision lots. (*See id.* at 8, 11, 13.) Park testified that he previously developed an industrial subdivision in Estacada and it took approximately nine years to sell all of the lots. Based on the rate of absorption of Park's previous industrial development, Taylor concluded it would take "about 9 years" for all the subdivision lots to sell. (*Id.* at 6.) Based on Consumer Price Index data, Taylor calculated a rate of inflation of 2.4 percent per year. (*Id.* at 10.)

Taylor wrote that his valuation method differed from approaches using a "developer's discount" because he did not rely on the subdivision lots being owned by one person. (Ptf's Ex 1 at 3.) He wrote that his method was to "focus on one lot of the 26 lots and appraise [it] as if all

---

[1] At trial, Taylor suggested the subdivision lots might have an "interim" highest and best use; namely, for sale to a developer of industrial sites.

lots were owned by separate owners." (*Id*.) Taylor calculated the per-square-foot value of one tax lot,[2] and calculated the value of the remaining lots by multiplying their area by that value. (*See id*. at 14–15.) He wrote that his adjustments to value using discounted cash flow analysis were meant to account for that lot's competition with every other lot, which would "either reduce selling prices or lengthen time to sell." (*Id*. at 5.)

1.      *Cost Approach*

Taylor testified that, under his cost approach, he sought to determine what it would cost to develop a 28-lot subdivision. He wrote that the subdivision lots were developed using state-originated loans totaling $2,825,867, plus engineering and management costs totaling $402,168. (Ptf's Ex 1 at 6–7.) Taylor testified that, using those two figures, he concluded the direct cost of development was $3,228,035, or $0.99 per square foot. (*Id*. at 7.) Taylor testified that he identified four land comparables; they ranged in size from 7.55 acres to 160 acres, in sale date from December 2012 to February 2014, and in sale price per square foot from $0.52 to $2.43. (*See id*.) Taylor testified that he concluded the value of the land was $1.25 per square foot and, adding the land value to the development cost, determined that the "actual cost" of the subject lots was $2.24 per square foot. (*Id*.) He testified that he calculated a developer's profit of $0.95 per square foot. (*See id.* at 9.)

Taylor used discounted cash flow analysis to calculate the entire subdivision's expected profit over the course of a nine-year absorption period. (Ptf's Ex 1 at 8.) He testified that he used nine years based on the time it took Park to sell all of the lots in his previous Estacada subdivision. Taylor applied his projected inflation of 2.4 percent per year and a discount rate of 10 percent. (*Id*.) He testified that he selected a 10 percent discount rate based on "a number of

---

[2] Taylor's report generally identified the lot appraised as Lot 17, but initially identified it as Lot 16. (*See* Ptf's Ex 1 at 3.) Both lots were identical in size and Taylor assigned both the same value. (*See id*. at 15.)

publications" and noted that eight percent is typical for apartments, which are a safer investment than a subdivision. (*See id.* at 9.) Taylor's analysis included projected income from sales of three lots per year, and expenses from holding costs comprising taxes, insurance, maintenance, and management. (*Id*. at 8.) After applying discounted cash flow analysis, Taylor concluded under his cost approach that the subdivision lots had a total present value of $3,699,043, or $3.19 per square foot. (*Id.*)

2.      *Market Approach*

Taylor wrote in his appraisal report that, at the time of trial, the unsold subject lots were listed for sale at $5.00 per square foot. (Ptf's Ex 1 at 9.) He testified that on January 1, 2014, they had been listed for more. Taylor provided three comparables—two sales and one listing— all from among the subdivision lots. (*Id.*) He testified that his first sale was a single 1.35-acre lot, which sold for $308,750 in May 2014, resulting in a price per square foot of $5.25.[3] Taylor testified that the listing he used as a comparable was a one-acre lot with a price of $5.00 per square foot.[4] (*Id.*) His third sale comprised two tax lots totaling 1.35 acres, which sold in June 2015 for $205,850, resulting in a price per square foot of $3.50. (*Id.*)

Taylor adjusted his comparables for inflation at 2.4 percent per year and he adjusted them for holding time. (Ptf's Ex 1 at 10-11.) Taylor testified that it would take nine years to sell all the lots in the subject property and, therefore, an average lot could be expected to sell in four and one-half years. (*See id*. at 11.) He wrote that he applied the same discounted cash flow analysis he used for his cost approach, concluding that the present value of each comparable lot should be

---

[3] Taylor testified that his appraisal report erroneously listed different data for his first sale. (*Cf.* Ptf's Ex 1 at 9.)

[4] Taylor testified that some of the data for the listing contained in his appraisal report was incorrect. He testified to an acreage differing from the acreage stated in the report, and he confirmed that the price per square foot given in the report was correct. Given that testimony, the "sale price" stated in the appraisal report must be incorrect, but Taylor did not testify to its correct value.

reduced by 32 percent due to the expected time of the sale. (*Id*. at 11.) Taylor's final adjusted comparable values were $3.25 per square foot, $3.40 per square foot, and $2.29 per square foot. (*Id*.) Taylor testified that he concluded under his market approach that the appraised lot had a value of $3.25 per square foot. (*Id*. at 12.)

　　　3.　　　*Income Approach*

Taylor wrote in his report that the subdivision lots were "not income property in the normal sense." (Ptf's Ex 1 at 12.) He wrote that discounted cash flow analysis was, nevertheless, useful to determine the value of an appraised lot because "if a prospective buyer expressed the idea that he or she might be interested in buying the lot in four or five years, that buyer might be induced to buy if shown that the waiting period would be compensated for." (*Id*.) Taylor's income approach used discounted cash flow analysis on a single lot over a 4.5-year period, again with a 2.4 percent inflation rate, a 10 percent discount rate, and expenses for holding costs. (*Id*. at 13.) Taylor testified that he reached a real market value of $3.38 per square foot using his income method. (*Id*.)

　　　4.　　　*Reconciliation*

Taylor wrote that he reconciled his three approaches "[w]ithout pinning a disproportion[ate] amount of weight on any one method * * *." (Ptf's Ex 1 at 14.) He testified that he reached a reconciled real market value per square foot of $3.30. (*See id.*)

B.　　　*Saunders' Appraisal*

Saunders testified that he prepared an appraisal of the subject lots and rested on his appraisal report. (*See* Def's Ex A.) Taylor declined to ask Saunders any questions about his appraisal report and stated that he agreed with Saunders' real market value conclusion, assuming the court accepts Saunders' valuation methodology.

Saunders determined the real market values of the 25 subject lots that did not have buildings using the sales comparison approach exclusively. (*See* Def's Ex A at 61.) He developed both a sales comparison approach and an income approach for Tax Lot 2800, the lot with a building. (*See id*.)

1.      *Sales Comparison Approach—25 Lots without Buildings*

In his appraisal report, Saunders identified six comparable "lot/land" sales, including the two sales within the subject lots' subdivision that Taylor identified in his report. (Def's Ex A at 43.) The sales occurred on dates ranging from December 2011 to June 2015. (*Id*.) The properties ranged in size from 40,176 square feet to 170,755 square feet. (*Id*.) The sales prices per square foot ranged from $2.98 to $6.36. (*Id*.) Additionally, Saunders wrote that 25 of the subject lots were listed at $5.50 per square foot on the date of valuation. (*Id*. at 45.)

Saunders wrote that he placed the most weight on his comparable sale 5, which was located within the subject lots' subdivision, and which sold in May 2014 for $5.25 per square foot. (Def's Ex A at 43-44.) That sale was also Taylor's comparable sale 1.[5] Saunders gave most weight to that sale because it was "located in the subject subdivision and [was] recent in date of sale, indicating $5.25 per [square foot] in comparison." (*Id*. at 45.) Saunders wrote that he "did not rely" on his other comparable sale within the subject lots' subdivision—which he reported sold for $4.60 per square foot in June 2015—because "it occurred 18 months after the date of valuation." (*Id*.) He wrote that his other three sales indicated the subject lots' values were "slightly more than $4.62 per [square foot], approximately $4.87 per [square foot], and less than $6.36 per [square foot] in comparison." (*Id*.) Saunders reported that the listing price of the 25 subject lots indicated their value was less than $5.50 per square foot on the valuation date.

_____
[5] As corrected by Taylor's testimony at trial.

(*Id.*) Saunders concluded under the sales comparison approach that the real market value of all the subject lots except Tax Lot 2800 was $5.25 per square foot as of January 1, 2014. (*Id.*)

2.      *Sales Comparison Approach—Tax Lot 2800*

In his appraisal report, Saunders identified four comparable sales of properties improved with buildings. (Def's Ex A at 51.) Those properties ranged in size from 14,026 square feet to 37,030 square feet, with sale dates from March 2013 through April 2014. (*Id.*) They were purchased at prices ranging from $73.68 per square foot to $108.00 per square foot. (*Id.*)

Saunders wrote that "[c]omparability of the sales to [Tax Lot 2800] is difficult" because the comparable properties were all located closer to Portland and closer to the freeway, although Tax Lot 2800's land-to-building ratio was superior to that of the comparable sales. (Def's Ex A at 55.) From his analysis of the comparable sales, Saunders found that Tax Lot 2800 was "slightly less" than $102.60 per square foot, "substantially more" than $73.68 per square foot, "more" than $93.27 per square foot, and "less" than $108.00 per square foot. (*Id.*) His conclusion under the sales comparison approach was that the real market value of Tax Lot 2800 was $100 per square foot, which amounts to a real market value of $480,000. (*Id.*)

3.      *Income Approach—Tax Lot 2800*

In his appraisal report, Saunders identified five rent comparables, two of which were located in Estacada, with the remainder located in Clackamas and Oregon City. (Def's Ex A at 57.) Those comparables were leased on a triple net basis, with blended rents per square foot ranging from $0.34 to $0.56 per month. (*Id.*) Saunders concluded that Tax Lot 2800's monthly market rent on the valuation date was $0.50 per square foot, resulting in a potential gross annual income of $28,800. (*Id.* at 59.) Based on data from a broker, Saunders concluded a five percent annual vacancy and collection loss, amounting to $1,440. (*Id.*) He estimated annual operating

expenses of four percent, amounting to $1,094. (*Id*.) Saunders determined the annual net operating income to be $26,266. (*Id*.)

In his appraisal report, Saunders analyzed overall capitalization rates extracted from his comparable sales and from an additional sale, finding a range from 4.95 percent to 5.67 percent. (Def's Ex A at 60.) He concluded that an overall capitalization rate near the "upper end" of the range was appropriate because Tax Lot 2800 "has more risk than a property located in the Portland area." (*Id*.) Saunders concluded that Tax Lot 2800's overall capitalization rate was 5.60 percent. (*Id*.) By dividing the estimated net operating income by the overall capitalization rate, he concluded a value for Tax Lot 2800 of $469,036 under the income approach. (*Id*.)

4.      *Reconciliation*

Saunders wrote that he placed the most weight on the sales comparison approach. (Def's Ex A at 61.) He concluded the subject lots' real market values were equal to $480,000 for Tax Lot 2800 and to $5.25 per square foot for each of the remaining subject lots. (*See id*. at 62.)

## II. ANALYSIS

The issue in this case is the real market value of the subject lots. At trial, Taylor stated that the parties' disagreement about value arose largely from a disagreement about the valuation methodology required by ORS 308.205.[6] Taylor stated that Plaintiff would accept Defendant's value if the court found that Saunders' methodology was correct.

The burden of proof falls on Plaintiff, the party seeking affirmative relief from the tax assessment. *See* ORS 305.427. Plaintiff will have proved its case if a "preponderance of the evidence" shows it is entitled to relief. *See id*. Asserted facts are proven by a preponderance of the evidence when they are shown to be "more probably true than false." *Cook v. Michael*,

---

[6] Unless otherwise noted, the court's references to the Oregon Revised Statutes (ORS) are to 2013.

214 Or 513, 527, 330 P2d 1026 (1958). Ultimately, this court has jurisdiction to determine real market value "without regard to the values pleaded by the parties." ORS 305.412.

ORS 308.205(1) defines real market value for the purposes of tax assessment as follows:

> "Real market value of all *property*, real and personal, means the amount in cash that could *reasonably be expected* to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

(Emphases added.) Taylor reads ORS 308.205(1) as requiring property to be valued at the price for which it could reasonably expected to sell during the tax year.[7] Taylor argues that the real market value of *each* of the subject lots can only be found by assuming that *all* of the subject lots will sell during the tax year at issue. Taylor contends that it cannot "be reasonably expected" that each tax lot would sell for the same price at which it would sell if it were the only lot sold. (Ptf's Ex 1 at 3-4.) Therefore, each of Taylor's valuation methods uses discounted cash flow analysis to calculate the amount by which the sale price of each subject lot must be reduced in order to reasonably expect to sell all of the lots in one year.

Implicit in Taylor's interpretation of a "reasonably * * * expected" sale price under ORS 308.205(1) is an interpretation of the statute's use of the word "property." To be consistent with Taylor's view, the "property" projected to be sold within the tax year must include a group of tax lots, not just one individual tax lot—at least where, as here, each tax lot is a part of a subdivision. If, instead, the "property" of ORS 308.205(1) was one individual tax lot, then that tax lot would have to be valued without assuming the sale of other lots in the subdivision. Therefore, if "property" in ORS 308.205(1) was to refer only to a single tax lot, Taylor's rationale for using discounted cash flow analysis would no longer hold.

---

[7] Taylor stated his view that the relevant time for the valuation of the subject lots under ORS 308.205(1) was not limited to the assessment date, but included the entire tax year. The court does not adopt Taylor's view on that question, but its analysis of this case is unaffected by it.

The Oregon Supreme Court considered the term "property" as used in ORS 308.205(1) in *First Interstate Bank v. Dept. of Rev.*, 306 Or 450, 453, 760 P2d 880 (1988). The court held that each tax lot in a "fully developed" subdivision—*i.e.*, a subdivision developed with roads and utilities—must be assessed individually. The court's holding was based on reading ORS 308.205 (1981) in the context of other assessment statutes:

> "Based solely on its context within the statute, 'property' could mean tax lot or it could mean a group of tax lots. ORS 308.205, like all statutes, must be read in the context of other statutes. ORS 308.210(2), (3) and (4) provide for the possibilities that properties can be divided and combined. ORS 308.215(1) provides that the assessment roll shall list each *parcel* of real property. We believe that, when taken in the context of these other relevant statutes, ORS 308.205 requires the true cash value of each tax lot to be assessed separately. The value of each lot by itself, not as a portion of a larger piece of property, must be assessed."

*First Interstate Bank*, 306 Or at 453 (emphasis in original). Although ORS 308.205(1) has since been amended to make the standard of valuation "real market value" rather than "true cash value," the other statutes cited by the court still provide for division and combination of properties, and for the listing of parcels on the assessment roll. *See* ORS 308.210(2), (3), (4); ORS 308.215(1). The current context of ORS 308.205(1) therefore still supports the conclusion reached in *First Interstate Bank*. The price to "reasonably be expected" under ORS 308.205(1) is the price at which one tax lot by itself—not as part of a larger subdivision—would sell on the assessment date.

In the present case, Taylor assigned a value to each tax lot that includes adjustments for the entire subdivision's projected time to sell out. By considering the sale of all the other subdivision lots when valuing any one subject lot, Taylor's method fails to value each of the subject tax lots separately. *See First Interstate Bank*, 306 Or at 453. Effectively, Taylor's valuation method provides the value of the subdivision to a single owner—or a coordinated group of owners—rather than to the market, and then assigns each of the subject lots a

proportional share of that total "owner value." ORS 308.205(1), in contrast, requires the tax rolls to be set from the market value, "not the market value less a cost to hold." *First Interstate Bank,* 306 Or at 456.

Taylor's appraisal methodology is indistinguishable from the unconstitutional "developer's discount" method, in which the market value of subdivision lots under common ownership is discounted "based on the time required to sell all of the lots individually." *First Interstate Bank v. Dept. of Rev.*, 10 OTR 452, 454 (1987), *aff'd* 306 Or 450, 760 P2d 880 (1988). This court held that a statute requiring valuation using the developer's discount method "directly violates the basic protection afforded by Article I, section 32, of the Oregon Constitution." *Mathias v. Dept. of Rev.*, 11 OTR 347, 352 (1990), *aff'd* 312 Or 50 (1991). The court explained the consequences of setting tax rolls using developer's discount valuation:

> "Property of the same class, *i.e.*, lots in subdivisions, are not subject to uniform taxation. Owners of lots of equal true cash value would not pay taxes on equal values. This is not because the properties are different or are used differently but simply because the owners are different. It is difficult for this court to imagine a more discriminatory scheme."

*Id.*

Taylor argued that his appraisal method did not rely on common ownership of the subject lots and provided a hypothetical situation in which a developer died and left the lots to numerous heirs. However, Taylor's discounted cash flow analysis spreads out the adjustments for inflation and holding costs across all of the subdivision lots—a method that does not make sense if each owner is independent. Ultimately, Taylor did not provide market evidence to support his valuation theory. The market evidence before the court—including a sale of a subdivision lot near the assessment date—supports Saunders' valuation of $5.25 per square foot.

/ / /

The court has jurisdiction to determine the real market value of the subject lots "without regard to the values pleaded by the parties." ORS 305.412. Taylor stated that if the court disagreed with his appraisal method, he would accept Defendant's valuation. In light of controlling precedent, the court disagrees with Taylor's method. Taylor's method is calculated to reach the value of the subject lots to their owner—who must take into account holding costs—rather than the value of the lots to the market as required by ORS 308.205(1). The court accepts Saunders' valuation of the subject lots. Plaintiff's appeal must be denied.

### III. CONCLUSION

After careful consideration, the court finds that Taylor's appraisal method did not arrive at real market value as required by ORS 308.205(1), and the court accepts Saunders' determination of the subject lots' real market value. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ___ day of December 2015.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was filed and entered on December 1, 2015.*